GAMMA–10 PLASTICS, INC., Plaintiff,

v.

AMERICAN PRESIDENT LINES, LTD. and American President Companies, Ltd., Defendants.

Civ. No. 3–90–428.

United States District Court, D. Minnesota, Third Division.

Dec. 17, 1993.

Scott Allen Johnson, Johnson Law Office, Wayzata, MN, for plaintiff.

William H. Rice, II, Meagher·& Geer, Minneapolis, MN, Harold L. Witsaman, Ray Robinson Hanninen & Carle, Michael A. Snyder, Kristine L. Poole, Ray Robinson Carle Davies & Snyder, Chicago, IL, for defendants.

## ORDER

RENNER, Senior District Judge.

Plaintiff Gamma–10 Plastics, Inc. moves for prejudgment interest on its verdict of $500,000 against American President Lines, Ltd. and American President Companies, Ltd. (collectively APL). The court awards Gamma–10 $308,417.

## I. Background

Gamma–10's business was selling polypropylene resin, a raw material from which plastic products are molded. Gamma–10 purchased trim left over from the production of diapers and contracted with companies known as compounders to reprocess the trim into resin pellets. Gamma–10 then sold the resin to manufacturers of plastic items.

In 1988 Gamma–10 contracted with a buyer in China, VIC International, for the sale of a quantity of resin. Gamma–10 and VIC International also had an agreement covering sales for five years into the future. Gamma–10 contracted with APL to transport the first installment of resin to China. This first installment consisted of a total of 22 twenty-ton containers in five shipments, and had a contract value of approximately $540,000. There were, to put it mildly, problems with these shipments, problems which Gamma–10 asserts led to its demise as a viable business entity.

Gamma–10 claimed that APL negligently mishandled the shipments of resin, thus preventing VIC International from taking delivery of the first installment on time. As a result, Gamma–10 argued, VIC International canceled both the order for containers Gamma–10 had already shipped, and the long-term supply agreement. Gamma–10 further asserted that it could not quickly resell the resin at a market price. It eventually did resell the 22 containers of resin, but at a price substantially below the market rate and after accruing significant storage and shipment costs. However, Gamma–10 claimed that because most of its capital was tied up for so long in shipments sitting in warehouses in China and elsewhere, it was forced to go out of business.

Gamma–10 contended at trial that it suffered $90,000,000 in damages as a result of its inability to sell the 22 containers of resin at the contract price, the loss of the long-term supply contract with VIC International, and the loss of other profits from 1988 through 1993. The jury found for Gamma–10 on its negligence claim, but awarded only $500,000 in damages. Following the verdict, Gamma–10 moved for prejudgment interest.

## II. Discussion

■ The Court has previously addressed Gamma–10's entitlement under Eighth Cir-

cuit precedent to prejudgment interest. In an admiralty action such as this one, a prevailing plaintiff is entitled to prejudgment interest " 'unless there are exceptional or peculiar circumstances.' " *United States v. American Commercial Barge Line Co.*, 988 F.2d 860, 863 (8th Cir.1993) (quoting *Mid-America Transportation Co. v. Rose Barge Line*, 477 F.2d 914, 916 (8th Cir.1973)). Because APL failed to cite any relevant exceptional or peculiar circumstances, the Court held that there were no grounds for denying Gamma–10's motion.

All that remains is the calculation of the amount of interest to which Gamma–10 is entitled. Determining the amount of prejudgment interest is a factual inquiry to be resolved on the basis of the evidence presented to the court. *See Ohio River Co. v. Peavey Co.*, 731 F.2d 547, 549–50 (8th Cir. 1984). Because the parties' initial memoranda did not lay a sufficient evidentiary foundation for a determination of the interest to be assessed, the Court requested that the parties submit supplemental memoranda on the amount and period over which to assess interest, the interest rate, and the frequency of compounding.

## A. Amount Against and Period Over Which to Assess Interest

■ The first issue is the amount of money against and the period over which to assess interest. Interest must be computed from when the claim accrues until judgment is entered. *West Virginia v. United States*, 479 U.S. 305, 310 n. 2, 107 S.Ct. 702, 706 n. 2, 93 L.Ed.2d 639 (1987). At trial Gamma–10 claimed damages both from the loss of the sale of the 22 containers of resin it entrusted to APL, and from the loss of profits from 1988 to 1993.

■ Gamma–10's claim for the loss of the resin arose on the date Gamma–10 would have received payment under the contract with VIC International. Therefore, any part of the jury's award that is compensation for that claim should accrue interest from that date. But any portion of the award that reflects a loss of profits from later sales should accrue interest only from the point at

which Gamma–10 would have earned those profits.

The special verdict form did not ask the jury to indicate whether it intended to award Gamma–10 damages for the loss of the 22 containers, the loss of future profits, or some combination. The size of the verdict, however, is evidence of what category of damages the jury intended to award. The amount of the judgment is close to the approximately $540,000 contract value of the shipments. The closeness of the round-figure award of $500,000 to the contract value of the shipments suggests the jury concluded that APL was responsible for Gamma–10's loss on the 22 containers of resin, but not any loss of future profits. Moreover, the jury could not reasonably have concluded that APL handled the resin shipments non-negligently, but nevertheless caused Gamma–10 to lose future profits. As for the reduced price at which Gamma–10 later sold the 22 containers of resin, the jury may well have concluded that it was offset by the extra time, effort, and expense required to resell the resin. Therefore, the Court concludes that the entire amount of the jury's award represents damages Gamma–10 incurred as a result of and at the time VIC International's cancellation of the contract. Gamma–10 is thus entitled to interest on the whole amount of the judgment from the date it incurred the loss to the date the judgment was entered.

Gamma–10's claim first arose on the date it was entitled to be, but was not, paid by VIC International. Unfortunately, neither party's briefs indicate what this date was. APL's brief, however, presumes that Gamma–10 incurred all of its losses under the contract on October 4, 1988, the date VIC International was to take delivery of the first shipment of resin. In the absence of more precise evidence of when Gamma–10's claim arose, the Court concludes that it is entitled to interest from October 4, 1988 to July 19, 1993, the date judgment was entered.

## B. Interest Rate

■ The next issue is what the interest rate should be. The principal purpose of an award of prejudgment interest is to ensure that the injured party is fully compensated.

*See West Virginia,* 479 U.S. at 310 n. 2, 107 S.Ct. at 706 n. 2. Two subsidiary purposes are to prevent the wrongdoer from gaining a windfall and to remove an incentive to prolong litigation. *See General Motors Corp. v. Devex Corp.,* 461 U.S. 648, 655 n. 10, 103 S.Ct. 2058, 2062 n. 10, 76 L.Ed.2d 211 (1983). Thus, the rate applied should reflect the rate prevailing during the relevant period. *See United States v. Motor Vessel Gopher State,* 614 F.2d 1186, 1190 (8th Cir.1980); *Matter of Oil Spill by the Amoco Cadiz,* 954 F.2d 1279, 1332 (7th Cir.1992). Determining the market rate is a factual inquiry which the court must resolve on the basis of the evidence presented to it. *Ohio River Co.,* 731 F.2d at 550.

But whose rate in which market? Neither the Supreme Court nor the Eighth Circuit Court of Appeals has addressed this issue. *See, e.g., West Virginia,* 479 U.S. at 310 n. 2, 107 S.Ct. at 706 n. 2 (merely noting that prejudgment interest "serves to compensate for the loss of use of money due as damages"). The Seventh Circuit Court of Appeals, however, has confronted the problem. Two Seventh Circuit opinions dealing with prejudgment interest conceive of a prevailing tort plaintiff as an unwilling creditor of the defendant. *Amoco Cadiz,* 954 F.2d at 1332; *Gorenstein Enterprises v. Quality Care–USA,* 874 F.2d 431, 436 (7th Cir.1989). This perspective led the *Amoco* and *Gorenstein* courts to conclude that the appropriate rate is that which the defendant would have had to pay to borrow money during the relevant period. *Amoco Cadiz,* 954 F.2d at 1332; *Gorenstein,* 874 F.2d at 436. The premise for this conclusion is that what the defendant would have had to pay during the term of the "loan" reflects the three elements of a market rate; the social return on investment, i.e., how much it would have cost to bid money away from other productive uses; anticipated inflation during the term of the loan; and the risk of nonpayment. *Amoco Cadiz,* 954 at 1332.

The *Amoco* and *Gorenstein* courts suggested that district courts engage in either "refined rate-setting" or use the prime rate. *Amoco Cadiz,* 954 F.2d at 1332; *Gorenstein,* 874 F.2d at 436. "Refined rate-setting" would entail determining what the defendant actually would have paid to borrow money during the litigation. *Amoco Cadiz,* 954 F.2d at 1332. On the other hand, the Seventh Circuit suggested, courts could use the prime rate because it is readily ascertainable, reasonably fair approximation of a defendant's cost of funds. *Id.* The prime rate is the rate banks charge their most credit-worthy customers for short-term unsecured loans. *Id.*

Although the Seventh Circuit's approach is based on an intriguing view of the relationship between a prevailing plaintiff and a defendant, it does not always fully effectuate the purposes of an award of prejudgment interest. If the only purposes for awarding prejudgment interest were to avoid granting the wrongdoer a windfall and to remove the incentive to prolong litigation, the appropriate rate would indeed be the cost of money to the wrongdoer during the relevant period.

The primary purpose of awarding prejudgment interest, however, is to fully compensate the injured party for the loss of use of money. If the injured party could have earned more with the money than the wrongdoer would have paid to borrow it, awarding interest at the wrongdoer's rate would undercompensate the injured party. Therefore, in determining the interest rate, the aim should be to award the greater of the cost of money to the wrongdoer or the return the injured party could have earned.

█ To assist the court in determining the appropriate rate, Gamma–10 has offered evidence of three different types of rates: (1) the return it would have achieved had it invested the money in its own business, (2) the rate Gamma–10 would have had to pay to borrow a similar sum of money, and (3) the return Gamma–10 could have achieved by investing the money in stocks or bonds.

Gamma–10 argues that the court should base the interest award on the rate it claims it would have achieved by investing the money in its own business. Had it received the $500,000 at the time its claim arose, according to Gamma–10, it would have invested the money in its business, just as would any other prudent company under similar circumstances. Based on the extensive evidence about the operations of Gamma–10 that it

heard at trial, the court has no reason to doubt this. The appropriate compensation to Gamma–10 for its loss of the use of the $500,000, therefore, would be an award of interest at the rate Gamma–10 would have earned during the relevant period.

Based on extrapolations from its activities before the ill-fated China sale, Gamma–10's expert Donald Gorowsky states that from 1988 to 1993, Gamma–10 would have achieved an average annual profit return of 31.27 per cent. Compounded annually, Gorowsky states that this rate would yield $1,448,935 on $500,000 between July 1, 1988 and July 1, 1993.

The jury's verdict, however, precludes an award of interest based on the profits Gamma–10 would have earned by investing the amount of the judgment in its business. At trial, Gamma–10 established that shortly after the contract with VIC International fell through in 1988, it effectively ceased operations. The only significant activities Gamma–10 conducted after the contract fell through were its efforts to find a new buyer for the shipments of resin in APL's possession.

Although the jury agreed with Gamma–10's claim that APL was negligent with respect to the shipments of resin, the amount it awarded Gamma–10 was slightly less than the contract cost of the shipments of resin. Therefore, as the court has already concluded, the jury implicitly but clearly refused to award damages for any loss of future profits. This implies, in turn, that the jury concluded that Gamma–10 would have failed regardless of APL's negligence. Because Gamma–10 would have failed despite APL's negligence, it would not have shown any return on the $500,000 by the summer of 1993.

■ The second measure Gamma–10 suggests is the rate it would have had to pay to borrow $500,000 during the relevant period. Gamma–10 contends that because it was a new company with a short track record, it would have had to pay a commercial lender the prime rate plus 3 per cent. This measure is irrelevant because there is no evidence that Gamma–10 did or could have borrowed any money to make up for the losses associated with the APL shipment. Had Gamma–10 borrowed $500,000, an award of interest at the rate it would have paid for the loan would, of course, very closely reflect the cost to Gamma–10 of the loss of use of the money.

■ The third measure, the return on an "average risk or low risk" investment, Gamma–10 argues, is a good measure of the return on an average, acceptable risk investment. This would be reflected by the performance of the Dow Jones Average of 30 Industrials, the Standard and Poors 500 Stock Index, or the Lehman Brothers Government and Corporate Bond Index over the relevant period. This measure is irrelevant because there is no evidence that had Gamma–10 been awarded the $500,000 at the time its claim arose, it would have invested the money in stocks or bonds. Indeed, Gamma–10 asserts that it would have invested the money in its own business.

■ Because Gamma–10 suffered no damages as a result of the loss of use of the amount of the judgment, it is entitled to interest only under the two subsidiary rationales, prevention of unjust enrichment and avoidance of incentive to delay. Under both of these rationales, the relevant measure is the cost of funds to the wrongdoer during the relevant period.

Neither side has submitted highly persuasive evidence of what APL's cost of funds was from 1986 to 1993. Gamma–10 states that, according to APL's financial statements, APL paid annual interest rates of between 10.31% and 11.05% between the date of Gamma–10's claim and the date of judgment. Gamma–10 contends that these rates reflect what APL would have paid to borrow the amount of the judgment over the relevant period. The average rate APL was paying on its existing, long-term loans during this period does not, however, necessarily reflect what it would have paid for a new, additional loan taken out in 1988.

In a late submission supported only by a letter written by its assistant treasurer, APL provides the rates it earned on excess balances from 1986 to 1992. For 1993, APL supplies its average one month rate under a

revolving credit agreement, because, it states, it has been a net short-term borrower during this period. The court infers that APL is asserting that it would merely have reduced its cash reserves rather than borrow the amount of the judgment from 1988 to 1991, and that during 1993 it would have taken out a short-term loan. APL provides no evidence, however, that it had enough excess cash to do this, or that, even if it did have sufficient cash, that it would in fact have done so. The court notes, moreover, that APL's financial statements for 1990, 1991, and 1992 list as a long-term debt a note for $660,000. This suggests that APL would have treated the amount of the judgment as a long-term debt rather than reduce its cash reserves or take out a short-term loan.

The court concludes that it is more likely that APL would have taken out a long-term loan for the $500,000 rather than reduce its cash accounts by that amount or take out a short-term revolving loan. Therefore, the court will assess interest at the rates suggested by Gamma–10.

### C. Compounding

Because the award of prejudgment interest in this case is based on the cost of money to APL, interest on the judgment should be compounded at the same frequency that APL would have had to make payments on a loan of $500,000. This rate of compounding would duplicate the effective interest rate to APL had it taken out a loan for $500,000 in 1988 and added the amount of interest due to the principal as the interest payments came due. In the absence of any evidence that the interest should be compounded more frequently, the court accepts Gamma–10's annual compounding.

Using the interest rates APL paid on its outstanding loans and compounding annually, APL would have paid $308,417 to borrow $500,000 from the date Gamma–10's claim arose to the day judgment was entered. The court concludes, therefore, that Gamma–10 is entitled to $308,417 in prejudgment interest on its judgment.

Accordingly, the court **GRANTS** Gamma–10's motion and awards it $308,417 in prejudgment interest to be paid by APL.