**GAMMA–10 PLASTICS, INC., Plaintiff, Appellant and Cross–Appellee,**

**v.**

**AMERICAN PRESIDENT LINES, LTD.; American President Companies, Ltd., Defendants, Appellees and Cross–Appellants.**

Nos. 93–3285, 93–3286 and 94–1190.

United States Court of Appeals, Eighth Circuit.

Submitted May 11, 1994.

Decided Aug. 10, 1994.

Scott Allen Johnson, Wayzata, MN, argued (Todd M. Johnson, on the brief), for appellants.

Ray Robinson, Chicago, IL, argued, for appellee.

Before McMILLIAN, Circuit Judge, LIVELY,* Senior Circuit Judge, and WOLLMAN, Circuit Judge.

LIVELY, Senior Circuit Judge.

A jury in this maritime case rendered a verdict in favor of the shipper and against the carrier for failure to deliver goods and for damages to other goods caused by negligence of the carrier. In post-trial proceedings the district court awarded pre-judgment interest to the plaintiff, but refused to award attorney fees. 839 F.Supp. 1359. Both parties appealed and the court consolidated the appeals from the judgment following trial and from the order deciding post-trial motions.

## I.

### A.

This case arises out of a 1988 contract for carriage by sea between Gamma–10 Plastics, Inc. (G–10) and American President Lines, Ltd. (APL). The contract called for APL, one of the largest steamship carriers in the world, to transport G–10's plastic resin from the United States and deliver it to customers at various ports in China. The resin was packed in bags, which in turn were placed by

APL in large sealed containers for shipment. The controversy concerns four shipments of plastic resin: (1) five sealed containers of resin shipped to Whampoa, China in August, 1988; (2) five containers shipped to Shanghai, China, in October, 1988; (3) six containers shipped to Hong Kong in October, 1988; and (4) four containers held by APL in Los Angeles after a dispute arose over the previous shipments.

Somehow, G–10's first shipment of resin was lost on the docks of Whampoa. Throughout the investigation of the lost goods, APL claimed that they were on the Tung Kwong Hau Pier (Tung Pier), and provided G–10 with the name and telephone number of a contact person in Whampoa for verification. APL maintained at trial that there was nobody present at the docks to pick up the resin because G–10 had a poor product and lost its principal Chinese contract (the Acada contract) with Wallon Energies. G–10, on the other hand, claimed that a second Chinese company, Vic International, assumed the Acada contract and that an agent for Vic International went to Tung Pier three times in search of the goods but never found them. In response to the loss of its resin, G–10 sent APL two written complaints for lost or missing goods in October and November of 1988. APL ignored the complaints, and G–10 charged that APL's conduct became vindictive after the grievances were filed.

G–10's second shipment was loaded on board ship at Los Angeles on September 8, 1988, and discharged at Hong Kong on September 24. For some reason APL did not make out a bill of lading for this shipment until October 4, 1988, after the resin had been unloaded in Hong King. According to G–10's president, this shipment was supposed to have gone directly to Shanghai. At any rate, because Vic International succeeded the original purchaser, Wallon Energies, as consignee, G–10 directed APL to hold the shipment in Hong Kong until delivery in Shanghai could be arranged. There is some confusion as to the whereabouts of the goods prior to their reappearance in Shanghai on November 10. G–10 claims that it asked APL to deliver the goods to Shanghai by October 13, but that the goods did not arrive

---

* The HONORABLE PIERCE LIVELY, Senior Circuit Judge for the Sixth Circuit, sitting by designation.

timely. APL counters that G–10 did not release the goods to Shanghai until November 4, and that it dutifully shipped the goods by November 10.

In November, 1988, G–10's president, Joseph Kopstein, flew to China to find the missing resin from the two shipments. When he finally located the resin from the first shipment in Whampoa, someone had removed it from the sealed containers and many of the resin bags were ripped. G–10 contended at trial that as a result of the condition of the goods and the three month delay in locating them, it suffered the cancellation of the Acada contract and lost its primary Chinese customer, Vic International. As with the first shipment, when G–10 located the resin from the second shipment in Shanghai, it had been taken out of the sealed containers and damaged. After paying the ocean freight and storage charges, G–10 finally sold this resin on July 12, 1989.

G–10 alleges on appeal that after the first shipment was lost, APL purposefully interfered with its attempt to resell the million pounds of resin that remained in China. G–10's potential customers insisted on testing samples of the resin before buying large amounts. However, APL refused to provide access to the resin until G–10 paid $60,000 claimed to be due in shipping and storage costs. G–10 asserts that the costs claimed by APL resulted from APL mistakenly shipping the third batch of resin to China. G–10 sent this resin to Los Angeles, but specifically told APL not to transport it to Hong Kong. At oral argument APL admitted mistakenly shipping the resin. According to G–10, APL not only delivered the goods to China, but stored them in a very expensive Hong Kong terminal despite suggestions from APL's own Los Angeles office to store the goods in free storage at a nearby APL facility in Taiwan. G–10 further claims that APL violated U.S. shipping laws by charging it at a rate that was 30% higher than the published tariff permitted. G–10 thus contends that the $60,000 claimed by APL was not its responsibility.

G–10 cites several other instances of alleged misconduct by APL. For example, APL originally quoted G–10 a price of $7,240 to store its fourth shipment of resin in Los Angeles. However, G–10 claims that APL raised the price to $37,819 after G–10 filed the instant lawsuit. Also, after this lawsuit was filed G–10 found a buyer in Jakarta, Indonesia for the fourth shipment of resin. APL told G–10 that there was no published rate to Jakarta, and that it would cost $133,000 to ship 100 metric tons, considerably more than the shipment itself was worth. In an attempt to prove discrimination, G–10 asked an associate in the industry, Sandra Renner, to obtain a quote from APL to send the identical amount of resin to Jakarta. G–10 presented evidence that APL advised Renner there was a published rate to Jakarta, and that it would cost $13,900 to ship 100 metric tons.

### B.

G–10 filed this action against APL in a Minnesota state court on July 2, 1990. Soon after G–10 filed its complaint, APL removed the case to federal court in Minnesota under 28 U.S.C. § 1332, basing jurisdiction on diversity of citizenship. G–10 then filed an amended complaint in which it sought damages of $3,536,000 for negligence and negligent or intentional misrepresentation.

In its answer APL pled several affirmative defenses under the United States Carriage of Goods by Sea Act (COGSA), 46 U.S.C.App. § 1300–1315 (1988). As one defense, APL cited the COGSA statute of limitations that provides, "the carrier and the ship shall be discharged from all liability in respect of loss or damage unless suit is brought within one year after delivery of the goods or the date when the goods should have been delivered...." COGSA § 1303(6). APL claimed that it delivered all of G–10's resin between September 15 and November 15, 1988, but that G–10 did not file suit until July 2, 1990, more than one and one-half years after the last shipment of the goods.

G–10 moved for partial summary judgment on APL's affirmative defenses, which the district court granted. The district court agreed that APL could extend COGSA contractually by inserting appropriate language in a bill of lading. The court struck APL's affirmative defense of limitations, however, after finding that APL delivered its bill of lading to G–10 only after G–10's goods were shipped and that G–10, an inexperienced

shipper, was unaware of the contractual extension of COGSA in APL's bill of lading.

Midway through a five week trial, G–10 moved the court for permission to amend its pleadings to claim punitive damages. The district court refused, stating that G–10's evidence against APL was "circumstantial" and did not show "clear and convincing evidence of deliberate disregard for the plaintiff's rights or safety." The district court also rejected G–10's request to instruct the jury on punitive damages. After three days of deliberation, the jury returned a verdict in G–10's favor for $500,000, but also specifically found that APL did not commit fraud, and that G–10 owed APL almost $13,000 in unpaid freight for the first resin shipment to Whampoa.

## II.

In its cross-appeal APL seeks reversal of the district court's denial of its motion for summary judgment on the basis of limitations. Inasmuch as some or all of the remaining issues will become moot if we determine that G–10's suit was barred by limitations, we consider that question first, reviewing the district court's decision *de novo*. See *Cox v. Mid–American Dairymen, Inc.*, 13 F.3d 272, 274 (8th Cir.1993).

### A.

■ Two federal statutes set forth the rights, duties and obligations of shippers and carriers of cargo by sea. Congress enacted the Harter Act, 46 App.U.S.C. 190–196 (1988), in 1893. It governs shipments between "ports of the United States and foreign ports," and applies to the entire period that a carrier has possession of a shipper's goods, from prior to loading until after discharge. The Act contains no limitations period and specifically prohibits a carrier from inserting into its bill of lading a general release from negligence. However, carriers may "impose a limitations period on all claims against them for negligence, without violating the Act, so long as the time period specified is reasonable." *Ins. Co. of North America v. Puerto Rico Marine Management, Inc.*, 768 F.2d 470, 473 (1st Cir.1985), *cert. denied*, 474 U.S. 1102, 106 S.Ct. 885, 88 L.Ed.2d 920 (1986).

Congress enacted COGSA, which also defines rights, responsibilities and liabilities of carriers of goods by sea in 1936. COGSA represented the American enactment of the Hague Rules, which resulted from efforts in the 1920s to bring about uniformity and simplification of bills of lading used in international trade. *Union Ins. Society of Canton v. S.S. Elikon*, 642 F.2d 721, 723 (4th Cir. 1981). Unlike Harter, COGSA contains a one year statute of limitations for "all liability in respect of loss or damage" to goods shipped internationally. COGSA § 1303(6). COGSA supersedes the Harter Act only with regard to the time a shipper's goods are on board a carrier's ship. COGSA § 1311. Since by its terms COGSA applies only to the period between loading and discharge, it does not apply of its own force in a case like the present one, which involves an alleged loss of and damage to G–10's resin after APL unloaded it in China. If COGSA does not apply, then the Harter Act controls and there is no statute of limitations applicable to G–10's claims.

■ With respect to the first two shipments, APL concedes that COGSA does not itself apply because G–10's claims clearly arise from events occurring after its resin was unloaded from APL's ship. However, the terms of COGSA may be contractually extended by a carrier's bill of lading. COGSA § 1307; *Colgate Palmolive Co. v. S/S Dart Canada*, 724 F.2d 313, 315 (2d Cir. 1983), *cert. denied*, 466 U.S. 963, 104 S.Ct. 2181, 80 L.Ed.2d 562 (1984). Thus APL correctly states that it can extend COGSA's one year statute of limitations to the period after discharge of goods, thereby superseding the Harter Act and preventing G–10 from suing more than a year after injury. *Ins. Co. of North America v. Puerto Rico Marine Management, Inc.*, 768 F.2d 470, 475 (1st Cir.1985) (bill of lading similar to APL's extends one year statute of limitations to injury arising after discharge), *cert. denied*, 474 U.S. 1102, 106 S.Ct. 885, 88 L.Ed.2d 920 (1986); *Firestone Tire & Rubber Co. v. Almacenes Miramar, Inc.*, 452 F.Supp. 670 (D.P.R.), *aff'd*, 588 F.2d 817 (1st Cir.1978) (COGSA's one year statute of limitations supersedes Harter Act and controls where bill

of lading extends COGSA to period after discharge).

APL inserted the extended terms of COGSA into its bills of lading under a "clause paramount," which states that

> [t]he receipt, custody, carriage and delivery of the Goods are governed by the provisions of the transportation agreement evidenced hereby and incorporated by reference, including . . . (iii) the provisions of the U.S. Carriage of Goods by Sea Act, 1936, ("COGSA"). . . . [which] shall be extended to apply . . . before the Goods are loaded on and after they are discharged from the vessel, and throughout the entire time during which the Carrier is responsible for the Goods under the transportation agreement.

### B.

APL completed the bill of lading for the first shipment the day following loading and sent it by overnight mail to G–10. Although the president of G–10 denied receiving it until late September, the record belies this claim; the president negotiated the bill of lading at a bank on July 22. Since a carrier may extend the provisions of COGSA to the post-discharge period by incorporating COGSA into its bill of lading, APL argues that G–10 was bound by the terms of the "clause paramount." Even though G–10 had the bill of lading in hand immediately after the ship was loaded and sailed, it waited more than fifteen months after the cargo should have been delivered before bringing suit. Thus, APL asserts, this action was time-barred.

APL did not make out the bill of lading for the second shipment until after the shipment arrived in Hong Kong, and we cannot determine from the record when, if ever, this bill of lading was delivered. The bill of lading for this shipment is APL's standard bill, similar to the one used for the first shipment. The record contains no information about the bill of lading issued for transshipment from Hong Kong to Shanghai. APL gave its bill of lading number in answers to interrogatories, but it is not clear whether it was a standard APL bill of lading or one issued by the coastal carrier that moved the resin to Shanghai.

APL argues that the majority of courts that have addressed the issue have found shippers bound by the terms of COGSA so incorporated and extended, and that this court should contribute to uniformity in admiralty law by reversing the district court. APL argues that the two decisions relied upon by G–10 are "inapposite." We will discuss those cases more fully in our analysis of the issue. See *Encyclopedia Britannica, Inc. v. SS Hong Kong Producer,* 422 F.2d 7 (2d Cir.1969), *cert. denied,* 397 U.S. 964, 90 S.Ct. 998, 25 L.Ed.2d 255 (1970), and *Allstate Insurance Co. v. International Shipping Corp.,* 703 F.2d 497 (11th Cir.1983).

In addition to contending that G–10 had actual notice that the incorporated COGSA provisions required suit to be commenced within one year, APL argues that G–10 had constructive notice of this fact. APL issued its standard long form bill of lading to G–10. There was nothing "hidden or ingenious" in the bill and the clause paramount is not "unusual," according to APL. Because this bill of lading was on file with the Federal Maritime Commission (FMC), and available to all shippers, APL maintains that G–10 had constructive notice of its provisions.

### C.

G–10 counters these arguments with the straightforward assertion that the Harter Act, which contains no statute of limitations, applies to the facts of this case. In the absence of a statute of limitations, suit would be time-barred only by application of the equitable doctrine of laches. APL did not plead or attempt to prove the elements of laches, and the district court correctly did not consider that defense. Furthermore, G–10 says, it brought suit within a reasonable time.

G–10 contends that only a bilateral agreement between a shipper and a carrier can restrict the shipper's rights under the Harter Act, and that APL acted unilaterally in attempting to extend COGSA's provisions, through its bill of lading, to the post-discharge period. Under the Harter Act, a shipper must have knowledge of a carrier's attempt to limit its rights and a "fair opportunity" to respond. G–10 asserts that it had no opportunity to object to the incorporation

of extended COGSA rights into APL's bill of lading because APL did not deliver its bills until after the ships containing G–10's goods departed. According to G–10, a carrier's failure to deliver a bill of lading prior to departure of the ship bearing the shipper's cargo renders the terms of the bill "legally ineffective."

### III.

We must determine, on the facts of this case, the proper effect to be given to APL's incorporation of extended COGSA provisions by reference in the bills of lading issued to G–10.

### A.

A bill of lading is a contract of adhesion that is strictly enforced against the carrier. *Mori Seiki USA, Inc. v. M.V. Alligator Triumph,* 990 F.2d 444, 448 (9th Cir. 1993). One purpose of COGSA is "to protect shippers from the overreaching of carriers through contracts of adhesion and to provide incentive for careful transport and delivery of cargo." *Cameco, Inc. v. S.S. American Legion,* 514 F.2d 1291, 1300 (2d Cir.1974). When COGSA is inserted into a carrier's bill of lading it becomes a contractual term subject to the same interpretive rules to which any contractual clause is susceptible. *Colgate,* 724 F.2d at 315.

The District court found that G–10 did not have sufficient notice of the contractual terms placed in APL's bills of lading, not having received copies until after the goods were loaded and out of G–10's control. Although the parties disagree as to when G–10 finally acquired the bill of lading for the first shipment, it is clear that it was not until after G–10's resin was loaded for shipment to China. As stated, according to APL's answers to interrogatories, it did not issue the bill of lading for the second shipment until the ship bearing the resin had left port in the United States and actually arrived in Hong Kong. COGSA only applies to the post-discharge stage if the parties contractually agree to allow it to do so. Thus the critical question in this case is whether G–10 agreed to the extension of COGSA's provisions, including the 1–year limitations period, to include the

post-discharge stage. See *Davis Elliott International, Inc. v. Pan America Container Corp.,* 705 F.2d 705, 708–09 (3d Cir.1983) (summary judgment for carrier reversed to give shipper an opportunity to prove that it never agreed to apply COGSA to pre-loading stage). Included in this inquiry is the further question whether, once it received the bill of lading, G–10 had a "fair opportunity" to object to APL's attempt to extend the limitations provision to cover the post-delivery stage. *Mori Seika USA, Inc. v. M.V. Alligator Triumph,* 990 F.2d 444, 448–49 (9th Cir.1993); *Caterpillar Overseas, S.A. v. Marine Transport, Inc.,* 900 F.2d 714, 719 (4th Cir.1990).

### B.

The parties center their attention on *Encyclopedia Britannica, Inc. v. SS Hong Kong Producer,* 422 F.2d 7 (2d Cir.1969), *cert. denied,* 397 U.S. 964, 90 S.Ct. 998, 25 L.Ed.2d 255 (1970). In *Britannica,* 1300 cartons of books were damaged when a carrier stowed the books on deck for transport. The carrier issued the shipper, Britannica, a "short form" bill of lading that contained little information but notified Britannica where it could obtain a long form bill of lading. The long form bill of lading included a provision allowing the carrier to store goods on deck absent a specific request to the contrary by the shipper. Importantly, the short form bill of lading was issued *after* the delivery of the goods. Also, Britannica was not notified of the provisions in the bill of lading prior to shipment, had no previous dealings with the carrier, and had never seen the carrier's bill of lading.

After studying the historical backdrop of the Harter Act and COGSA, the Court of Appeals found that the bill of lading was not binding on Britannica. The court noted that COGSA was meant to alleviate the problems associated with hidden bill of lading terms and that "it is impractical for a shipper to be compelled to make a detailed study of all of the fine print clauses of the carrier's regular bill on each occasion *before it ships out a package.*" *Id.* at 14 (emphasis added). The court found that the carrier was estopped from asserting its rights under the bill of lading because it was not issued until after the goods were loaded, making it impossible

for Britannica to notify the carrier prior to delivery of a desire to have the goods stored beneath the deck. *Id.* at 16–17.

We have no doubt that *Britannica* was correctly decided under its facts. The only way Britannica could have objected in time to insist that the books be stored below deck was prior to shipping them out. Thus, the timing of the delivery of the bill of lading was critical. Because the carrier did not deliver a bill of lading until it was too late for the shipper to rectify the situation, the shipper did not have a fair opportunity to protect its goods. We do not believe, however, that *Britannica* stands for the proposition that a bill of lading sent to a shipper after the shipper's goods are loaded is never effective to delineate the terms and conditions of the passage of goods.

G–10 also places heavy reliance on *Allstate Ins. Co. v. International Shipping Corp.*, 703 F.2d 497 (11th Cir.1983). Like *Britannica*, *Allstate* involved a shipper's claim for damages caused by a carrier's handling of cargo. In *Allstate*, the shipper loaded goods in sealed container trailers for delivery to the carrier. A freight forwarder delivered the containers to a carrier that did not ship containers or trailers, and opened the sealed containers prior to shipment. The defendant freight forwarder never notified the shipper of the carrier's policy of unloading sealed containers. After unloading the containers, the carrier left the shipper's goods out in the weather and they arrived at their destination in a damaged condition. The district court found that the goods were damaged as a result of exposure to the elements prior to loading on board the ship and awarded damages to Allstate, the shipper's insurer and subrogee.

The court of appeals affirmed, finding that the short form bill of lading delivered to the shipper contained no indication that the shipper was bound by a statute of limitations. The carrier relied on the fact that the short form bill incorporated by reference both COGSA and the carrier's long form bill of lading that was on file with the FMC. The long form bill of lading contained a specific provision requiring the shipper to bring suit within one year of the delivery of the goods (COGSA's limitations provision did not apply because the injury to the goods occurred before shipment, and there was nothing in the bill to extend this provision to the pre-loading and post-delivery stages).

The Court of Appeals rejected the carrier's claim of constructive notice and found that the shipper did not have actual knowledge of the terms contained in the long form bill. The court stated:

> [W]e are reluctant to give effect to limiting clauses with which "a carrier could shield itself from liability through manipulation of fine print clauses contained in standardized contract forms." *Calmaquip Engineering West Hemisphere Corporation v. West Coast Carriers Ltd.*, 650 F.2d 633, 639–40 (5th Cir. Unit B 1981) *citing Encyclopedia Britannica, supra* at 14. In this regard we follow the Second Circuit's decision in *Encyclopedia Britannica, supra;* we will not limit the period within which Allstate could bring suit when that limit was expressed in fine print in a document never specifically brought to Allstate or Alumax' attention, and when neither Allstate nor Alumax had actual knowledge of its terms. *Id.* at 14.[4] This is particularly so where the limitation arguably conflicts with the absence of a specific limitations period under the Harter Act.

> [4] It is hard to say even International [the freight forwarder] had knowledge actual or constructive, inasmuch as the district court found International received the bills of lading *after* the ISLA DEL SOL sailed. (emphasis in original).

*Id.* at 500.

There are several obvious differences between the present case and *Allstate*. First and most important is the fact that the only document ever given to the shipper in *Allstate* was the short form bill of lading, which contained no reference to limitations. The carrier never supplied the long form bill, which specifically set forth the requirement that suit be brought within one year. In the present case, on the other hand, APL did deliver the bill of lading for the first shipment within a few days after loading, and that bill not only adopted COGSA and extended its provisions to the post-delivery period, but also contained a separate paragraph, titled "TIME FOR SUIT" which stated unequivocally that the carrier would be relieved of all liability unless suits were

brought within one year after delivery of the goods, or after the time they should have been delivered. Second, the carrier in *Allstate* did not deliver even the short form bill until after the ship had sailed. The situation was similar to that in *Britannica*. By the time the short form bill was delivered the goods had already suffered injury and the shipper had no knowledge that they had been removed from the sealed containers and left exposed to the elements.

We believe *Britannica* and *Allstate* were correctly decided, but provide guidance on the effect of incorporating COGSA into bills of lading delivered after goods are loaded only for those cases in which the damage to goods occurs before the shipper has knowledge of an act of the carrier resulting in the damage and no fair opportunity to protest, cancel the agreement, or otherwise protect itself from the consequences of the carrier's acts.

In the present case, the goods in the first shipment were misplaced and ultimately damaged by mishandling after the voyage ended and long after the shipper received the bill of lading. Furthermore, G–10 knew the facts on which it based its claims related to the first shipment very soon after it was shipped. The president of G–10 flew to China in November of 1988, located the "lost" goods and found some of them damaged after being removed from sealed containers and left in a place where someone ripped open bags of resin. At this time G–10 had the bill of lading with its limitations provision in hand.

Although for some unexplained reason APL did not complete the bill of lading for the second shipment until the resin had been discharged in Hong Kong, if G–10 knew of the limitations provision, agreed to it and had a fair opportunity to avoid the detrimental effect of the limitations period, it was bound by this provision.

## IV.

Although a bill of lading is a contract of adhesion, the language in APL's bills is clear and we can only interpret it to mean what it says. Because it is undisputed that a carrier may alter the balance created by the Harter Act to the extent of creating a statute of limitations for suit by a shipper, the only issues are whether G–10 agreed to the limitations provision in the bills of lading and whether it had a fair opportunity to relieve itself of the burden on its rights thus created.

### A.

■ Contrary to G–10's assertion, the bill of lading for the first shipment was not a "unilateral" alteration of the agreement between it and APL of which it had no notice. Two days after the first shipment was loaded, G–10 negotiated the bill of lading at a Minnesota bank. An export negotiator at the bank testified that the original bill, introduced into evidence by APL, contained the typewritten legend "Gamma–10 Plastics, Inc.," followed by a signature line containing the signature of G–10's president. A true copy of the bill of lading containing the typed legend and signature appear in APL's appendix. From this evidence we conclude that G–10 accepted the contents of the bill of lading as part of its agreement with APL. Otherwise, it could not have negotiated the bill.

We turn now to whether G–10 had a "fair opportunity" to relieve itself of the burden placed on its right to recover from APL for loss and damage to the first two shipments created by the statute of limitations. The court in *Mori Seiki* described the Ninth Circuit's treatment of this issue as follows:

> In a dispute over "fair opportunity" such as this one, the carrier bears an initial burden of producing prima facie evidence which demonstrates that it provided such notice to the shipper. * * * Normally, the carrier can meet this initial burden by showing that the language of COGSA Section 4(5) [liability limitation] is contained in the bill of lading. * * * Language in the bill of lading "to the same effect" as the statute is adequate. * * * On the other hand, the mere incorporation of COGSA by reference is not adequate. * * * Once the carrier meets this initial burden, the burden of disproving fair opportunity [shifts] to the shipper.

990 F.2d at 449 (citations and quotation marks omitted).

■ Applying this analysis, we conclude that APL carried its initial burden with respect to the first shipment, and that G–10 failed to carry its burden of disproving fair opportunity. G–10 knew of APL's alleged derelictions with respect to this shipment, and in fact knew the extent of its injury at a time when it had received and accepted the bill of lading. Yet, it waited until after the limitations period described in the bill had expired before bringing suit. This is not a case where the bill of lading was delivered too late for the shipper to take action to avoid detriment arising from conditions first disclosed by the contents of the bill.

■ The record is quite different with respect to the second shipment. The record contains a copy of the front of the bill of lading, but there is no signature or other indication that anyone accepted or negotiated this bill on behalf of G–10. The record does reveal that the bill was not prepared until after APL's ship bearing the resin had reached Hong Kong, and it is silent as to when the bill of lading was delivered to G–10. We conclude that APL failed to carry its burden of proving that G–10 had notice and a fair opportunity to avoid the consequences of the attempted inclusion of a statute of limitations for claims arising from post-delivery damage to the goods. The district court properly denied APL's defense of limitations with respect to the second shipment.

**B.**

■ The facts of the third and attempted fourth shipments are unlike those surrounding the first two. Although the record shows that APL issued a bill of lading for the third shipment, the record is silent as to when, if ever, this bill of lading was delivered to G–10. Thus, APL failed to carry its burden of showing that G–10 had notice of the provisions incorporating and extending COGSA's statute of limitations or that G–10 ever accepted those terms. The district court correctly denied APL's defense of limitations to the extent it applied to the third shipment. Since APL held the last four containers and never shipped them, there was no bill of lading. Because COGSA applies only "tackle to tackle" and these containers were never

loaded on a ship, G–10 was entitled to go forward with its claims of negligence and negligent or intentional misrepresentation insofar as they applied to claims based on APL's mishandling of these four containers.

**C.**

■ We reject APL's contention that filing a bill of lading with the FMC gives a shipper constructive notice and binds the shipper to all conditions set forth in the bill of lading. We agree with the *Allstate* court and others that have held filing with the FMC gives a shipper notice only of the tariff. Limitation of liability provisions are not related to rates or charges and are not required to be included in the tariff. *Marvirazon Compania Naviera, S.A. v. H.J. Baker & Brothers*, 674 F.2d 364, 366 n. 1 and 2 (5th Cir.1982) (quoted in *Allstate*, 703 F.2d at 500).

**V.**

Inasmuch as a new trial is required on G–10's claims related to the second, third and fourth shipments, we consider next G–10's principal contention on appeal—that the district court abused its discretion in denying G–10's motion to amend its complaint to include a claim for punitive damages.

**A.**

■ The district court found that G–10 could potentially recover punitive damages under either federal maritime law or Minn. Stat. § 549.191. Under maritime law, punitive damages are warranted where the defendant has acted with "reckless or callous disregard for the rights of others or for conduct which shows gross negligence or actual malice or criminal indifference." *Churchill v. F/V Fjord*, 892 F.2d 763, 772 (9th Cir.1988), *cert. denied*, 497 U.S. 1025, 110 S.Ct. 3273, 111 L.Ed.2d 783 (1990); See also *Complaint of Merry Shipping, Inc.*, 650 F.2d 622, 625 (5th Cir.1981) (punitive damages warranted where defendant acts "willfully and with gross disregard for the plaintiff's rights").

■ In Minnesota, a plaintiff makes a prima facie case for punitive damages by

establishing "clear and convincing evidence that the acts of the defendant show deliberate disregard for the rights or safety of others." Minn.Stat. §§ 549.19, 549.20. A defendant operates with "deliberate disregard" by acting with intent or indifference to threaten the rights or safety of others. *Id.* A plaintiff may not place a claim for punitive damages in its original complaint, but must make a motion to amend its pleadings to include punitive damages. Minn.Stat. § 549.191. This policy was enacted to prevent frivolous punitive damage claims by allowing a court to determine first if punitive damages are appropriate. *Bougie v. Sibley Manor, Inc.,* 504 N.W.2d 493, 499 (Minn.App. 1993). The trial court has discretion in allowing a plaintiff to amend its complaint to assert punitive damages, *Robert Utecht v. Shopko Dept. Store,* 324 N.W.2d 652, 654 (Minn.1982), but "may not allow an amendment where the motion and supporting affidavits do not reasonably allow a conclusion that clear and convincing evidence will establish the defendant acted with willful indifference...." *Swanlund v. Shimano Industrial Corp., Ltd.,* 459 N.W.2d 151, 154 (Minn.App. 1990).

The district court gave the following explanation for its denial of G–10's motion to amend its complaint to include a claim for punitive damages:

> [G–10's] assertions provide at best only circumstantial evidence that APL acted recklessly, willfully, deliberately or with gross disregard for gamma–10's rights. APL could have committed all of the alleged acts with mere indifference to plaintiff's rights, thus the Court concludes that gamma–10 has not established a prima facie case by clear and convincing evidence under Minnesota law and has failed to present sufficient evidence to warrant punitive damages under maritime law. Accordingly, gamma–10's motion for leave to amend its complaint to state a claim for punitive damages is denied.

 Given Minnesota's requirement of clear and convincing evidence and the policy considerations behind Minn.Stat. § 549.191, we will not disturb the district court's ruling insofar as it refused to permit the amendment and instruct the jury that G–10 could recover punitive damages under Minnesota law. The claim for punitive damages under maritime law, as the district court recognized, presents a question of federal law and disposition of the motion to amend is controlled by FED.R.CIV.P. 15.

**B.**

Rule 15(a) provides that leave to amend "shall be freely given when justice so requires." Rule 15(b) states that "[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they have been raised in the pleadings." G–10 argues that it was entitled to amend under both Rule 15(a) and (b) and that the district court abused its discretion in denying the motion.

In *Foman v. Davis,* 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962), the Supreme Court prescribed the proper approach under Rule 15(a) when a party makes motion to amend pleadings:

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be "freely given." Of course, the grant or denial of an opportunity to amend is within the discretion of the District Court, but outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules.

*Id.* at 182, 83 S.Ct. at 230.

 This court has stated that a party's motion to amend should be dismissed on the merits "only if [it] assert[s] clearly frivolous claims or defenses." *Buder v. Merrill*

*Lynch, Pierce, Fenner & Smith, Inc.*, 644 F.2d 690, 695 (8th Cir.1981). Likelihood of success on the new claim is no basis for denying an amendment unless the claim asserted therein is clearly frivolous. *Id.* at 695. Based on G–10's assertions at trial, G–10's punitive damages claim was not "clearly frivolous" and the district court should have allowed G–10 to amend its complaint. APL's agents purportedly falsified custom applications in Whampoa, illegally emptied sealed containers full of resin onto the docks of Whampoa and Shanghai, ignored G–10's claims for lost goods, and after the goods were found refused to provide access to them. APL also mistakenly shipped goods it should not have, allegedly overcharged for storage of the mistakenly shipped goods, and misrepresented storage costs in Los Angeles and shipping costs to Jakarta.

 G–10 also contends that the district court should have permitted the amendment under Rule 15(b) because APL impliedly consented to litigation of the punitive damages issue. The court encourages granting amendments to conform to evidence received during trial. An amended complaint that "merely amplifies some of the allegations that have been proven" should be allowed. *Herrera v. Valentine*, 653 F.2d 1220, 1224 (8th Cir.1981). On the other hand, however, a district court is not required to grant a motion to amend on the basis of some evidence that would be relevant to the new claim if the same evidence was also relevant to a claim originally pled. The introduction of such evidence does "not provide the defendant any notice" that the implied claim was being tried. *Pariser v. Christian Health Care Systems, Inc.*, 816 F.2d 1248, 1253 (8th Cir.1987).

G–10 notified APL ten days before trial that "Gamma 10 intends to move the Court for a punitive damage instruction," and the district court found that "APL was clearly on notice before trial that Gamma–10 might seek punitive damages." The court also acknowledged that APL defended against a punitive damages claim, but reasoned that it was merely a "prudent litigation strategy" for APL to protect against a possible punitive damages claim pending the district

court's ruling on the matter. The court found that APL did not impliedly consent to trying the punitive damages issue, as was evidenced by APL's opposition to G–10's motion to amend its complaint.

Several times during the trial, G–10 pointed to APL's "deliberate disregard for the rights of Gamma–10," in reference to the Minnesota standard of punitive damages. Moreover, the district court allowed an APL claims manual into evidence over the objection of APL after G–10 argued that it was relevant to the "claim for punitive damages for deliberate disregard for the rights of Gamma–10." The district court also allowed an APL employee to discuss the inaccessibility of G–10's resin in China after G–10 argued that the evidence "goes to what we will be moving for in our punitive damages instruction. . . ." Finally, in closing argument APL itself questioned whether evidence introduced at trial showed that it acted with "deliberate disregard for someone's rights." APL even admits, in its brief on appeal, that G–10's original claims included "punitive damages, because of APL's refusal to release cargo to G–10 without payment of freight and port imposed demurrage charges."

Despite G–10's references to punitive damages during trial and the notice given to APL prior to trial, APL never objected to G–10's use of punitive damages evidence. *United States v. Sci., Inc.*, 828 F.2d 671, 677 (11th Cir.1987) (failure to object to evidence raising issues outside of pleadings constitutes implied consent). In fact, the district court found that APL defended against G–10's punitive damages claim. See *Herrera*, 653 F.2d at 1223–24 (where defendant introduces evidence in opposition to claim, issue is litigated by consent).

## C.

 We believe that the district court denied the motion to amend by weighing the likelihood of success on the punitive damages claim. The court found that the evidence offered by G–10 in support of punitive damages was "circumstantial" but it did not address the requirements of Rule 15. We conclude that Rule 15 required the court to grant G–10's motion unless the evidence was

clearly insufficient under maritime law to support a claim for punitive damages. G–10 put APL on notice early in the proceedings that it sought punitive damages. Further, at several points during the trial, counsel for G–10 argued with respect to proffered evidence that such evidence went to the question of punitive damages. Although some of the evidence related to G–10's breach of contract claim as well as a claim supporting punitive damages, the complaint charged APL with the torts of negligence and negligent or intentional misrepresentation and G–10 introduced evidence of conduct by APL that was relevant only to those claims. Throughout the trial G–10 sought to show that APL had acted with deliberate disregard for its rights and had acted maliciously toward it.

It is well settled that punitive damages may be recovered under general maritime law "for conduct which manifests reckless or callous disregard for the rights of others or for conduct which shows gross negligence or actual malice or criminal indifference." *Churchill v. F/V Fjord,* 892 F.2d 763, 772 (9th Cir.1988), *cert. denied,* 497 U.S. 1025, 110 S.Ct. 3273, 111 L.Ed.2d 783 (1990) (citation and interior quotation marks omitted). While admiralty law does not permit an award of punitive damages for breach of contract, it does permit such damages where the defendant's actions constitute an independent tort in addition to being a breach of contract. *Thyssen, Inc. v. S.S. Fortune Star,* 777 F.2d 57, 62–63 (2d Cir.1985) (citing Restatement (Second) of Contracts § 355 (1979)).

On the record before us we conclude that the district court abused its discretion in denying G–10's motion to amend the complaint to include a claim for punitive damages. G–10 made the denial one of its bases of its motion for a new trial. Upon remand, the district court will grant a new trial on the claims related to the second, third and fourth shipments of resin. If the evidence concerning APL's allegedly tortious conduct is substantially the same as at the first trial, the district court will instruct the jury on G–10's claim for punitive damages under maritime law.

## VI.

The remaining issues raised on appeal require little discussion.

We find no abuse of discretion in the district court's evidentiary rulings. We cannot anticipate situations that may arise at another trial requiring rulings on evidentiary matters. If evidentiary questions are raised at a second trial, however, the experienced trial judge will again exercise his discretion in disposing of them.

Likewise, we find no abuse of discretion in the trial court's denial of attorney fees. Attorney fees generally are not allowed in admiralty cases absent a showing that the losing party acted in bad faith. *Goodman v. 1973 26 Foot Trojan Vessel,* 859 F.2d 71, 74 (8th Cir.1988). The district court found that APL was not guilty of bad faith, and we will not disturb that finding.

The district court awarded G–10 prejudgment interest. We find the court's method of calculating prejudgment interest and the rate applied reasonable. If the jury awards G–10 damages at a second trial, the district court may award prejudgment interest on the same basis that it made the calculations following the first trial.

## CONCLUSION

The judgment of the district court is affirmed in part and reversed in part. The case is remanded for a new trial and such further proceedings as may be required, consistent with this opinion.