## MORI SEIKI USA, INC.,
Plaintiff–Appellant,

v.

## M.V. ALLIGATOR TRIUMPH,
her engines, tackle, etc.,
in rem, Defendant,

Mitsui O.S.K. Lines, Ltd.; Camellia Container Carrier, S.A. Panama; Trans Pacific Container Service Corporation, Marine Terminals Corporation, Defendants–Appellees.

No. 91–56430.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 3, 1993.

Decided March 23, 1993.

---

Paul Gary Sterling, Finan and Sterling, and William M. Duncan, Meadows, Smith, Lenker, Sterling & Davis, Long Beach, CA, for plaintiff-appellant.

Alan Nakazawa and B. Alexander Moghaddam, Williams, Woolley, Cogswell, Nakazawa & Russell, Long Beach, CA, Arthur A. Leonard, Sands, Narwitz, Forgie & Leonard, Los Angeles, CA, for defendants-appellees.

Before: HUG, SKOPIL, and O'SCANNLAIN, Circuit Judges.

HUG, Circuit Judge:

Appellant Mori Seiki USA, Inc. ("Mori Seiki") was the consignee of a precision lathe that was damaged while being transported from Nagoya, Japan to Houston, Texas. The lathe was damaged after it was unloaded from an ocean vessel at the Port of Los Angeles, but before it was released from the seaport. Mori Seiki filed suit in district court seeking damages from

the ocean carrier (Mitsui O.S.K. Lines, Ltd.), the ship (M.V. Alligator Triumph), the charterer/operator of the ship (Camellia Container Carrier, S.A. Panama), the seaport operator (Trans Pacific Container Service Corporation), and the stevedore services firm which unloaded and handled its lathe (Marine Terminals Corporation).

After partial summary judgment and trial, the district court held that the carrier's bill of lading limited the cumulative liability of all parties to $500 by contractually extending the liability limits already applicable under the Carriage of Goods by Sea Act ("COGSA"). Mori Seiki now appeals the district court's orders. We have jurisdiction under 28 U.S.C. § 1291 and we affirm.

## I.

### APPLICABILITY OF COGSA'S $500 PACKAGE LIMITATION AFTER DISCHARGE OF THE LATHE FROM THE SHIP

Mori Seiki contends that the district court erred by concluding that the bill of lading extended COGSA's $500 package liability limitation to the period during which the lathe was damaged, that is, the period after the lathe was discharged from the ship, but before it was released from the sea terminal. We disagree.

■ COGSA applies to all cargo shipments which are carried by sea, to or from the United States. *See* 46 U.S.C.App. §§ 1300–1315. By its own terms, COGSA limits liability for cargo damage to $500, if the damage occurs between the time the cargo is loaded on to the ship and the time it is discharged from the ship ("tackle to tackle"). 46 U.S.C.App. §§ 1304(5), 1301(e). Parties to a shipping agreement, however, may contractually extend the limitation period. 46 U.S.C.App. § 1307.

■ Section 7(2)(i) of the bill of lading at issue in this case, reads in relevant part:

[W]ith respect to loss or damage occurring during the period from the time when the Goods arrived at the sea terminal at the port of loading to the time when they left the sea terminal at the port of discharge ... [the carrier shall be

responsible for such loss or damage] to the extent prescribed by the applicable Hague Rules Legislation....

The parties do not dispute that COGSA constitutes the "Hague Rules Legislation" which is applicable to this case.

The plain meaning of this language is that COGSA's liability limitation would extend to the period after the lathe was discharged from the ship, but before it was released from the sea terminal. We believe that this is precisely the kind of extension of the limitation period which is contemplated and authorized by 46 U.S.C.App. § 1307 and note that at least two courts have read substantially similar language in the same way. *See B.M.A. Industries, Ltd. v. Nigerian Star Line, Ltd.*, 786 F.2d 90, 91 (2d Cir.1986); *GAF (Osterreich) GmbH v. Dart Containerline Co. Ltd.*, 541 F.Supp. 9, 11 (D.N.J.1981).

■ Mori Seiki contends that COGSA's liability limitation was not extended under the bill of lading. Mori Seiki argues that under Section 2 of the bill of lading, COGSA applies to the contract only to the extent that it applies by its own terms. Section 2 reads in relevant part:

As far as this Bill of Lading covers the carriage of the Goods by water, this Bill of Lading shall have effect subject to the provisions of the International Carriage of Goods by Sea Act, 1957 of Japan, unless it is adjudged that any other legislation of a nature similar to the International Convention for the Unification of Certain Rules relating to Bills of Lading signed at Brussels on August 25, 1924 compulsorily applies to this Bill of Lading, in which case it shall have effect subject to the provisions of such legislation, and the said Act or legislation (hereinafter called Hague Rules Legislation) shall be deemed to be incorporated herein.

Mori Seiki argues that under this language, Japan's International Carriage of Goods by Sea Act ("JCOGSA") governs the bill of lading, unless some other Hague Rules Legislation applies. Where some other country's legislation applies, it only applies

to the extent that it applies "compulsorily," that is, to the extent of its own terms. Because COGSA, which applies here, applies by its own terms only tackle to tackle, 46 U.S.C.App. § 1301(e), Mori Seiki concludes that the apparent extension of the limitation period in Section 7(2)(i) is not effective.

Mori Seiki misconstrues Section 2. Though the language states that JCOGSA will apply unless another statute applies "compulsorily," it does not state that such a statute will apply only to the extent it applies by its own terms. Where another statute is applicable, Section 2 clearly states that "it shall have effect subject to the provisions of such legislation, and ... shall be deemed to be incorporated herein." Under its own terms, the statute which is compulsorily applicable to the bill of lading in this case, COGSA, permits the extension of the liability limitation period. Accordingly, the extension under Section 7(2)(i) is not undermined by Section 2.

Moreover, we conclude that the case upon which Mori Seiki principally relies to support this argument, *Allstate Ins. Co. v. International Shipping Corp.*, 703 F.2d 497 (11th Cir.1983), is inapposite. In *Allstate*, a carrier sought the protection of COGSA's one year statute of limitations for cargo damage that occurred before the cargo was loaded on to a ship. The Eleventh Circuit Court of Appeals held that by its own terms, COGSA's statute of limitations does not apply to damage occurring at such a time. *Id.* at 499. The court also declined to give effect to an incorporated bill of lading provision which required a shipper to bring suit within one year. *Id.* at 500. Unlike the bill of lading at issue in this case, however, the bill of lading in *Allstate* did not include a provision, like Section 7(2)(i), that extended the period during which COGSA's package liability limitation would apply.

■ Alternatively, Mori Seiki argues that the bill of lading was a contract of adhesion, that its language was ambiguous, and that it should therefore be construed in Mori Seiki's favor. This argument also fails. Although it is true that a bill of lading is a contract of adhesion, which is "strictly construed against the carrier," *C-ART, Ltd. v. Hong Kong Islands Line America, S.A.*, 940 F.2d 530, 532 (9th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1762, 118 L.Ed.2d 425 (1992), and that "any ambiguity in the bill of lading must be construed in favor of the shipper and against the carrier," *Institute of London Underwriters v. Sea-Land Serv., Inc.* ("*London Underwriters*"), 881 F.2d 761, 767 (9th Cir.1989), we are not persuaded that such an ambiguity exists here. The only ambiguity in the bill of lading arises from Mori Seiki's strained reading of its provisions. Accordingly, the favorable construction that Mori Seiki seeks is not available. *See id.* (declining to adopt shipper's strained interpretation of passage where language is unambiguous).

We conclude, therefore, that the district court properly granted summary judgment in favor of appellees on the issue of whether the bill of lading extended COGSA's $500 liability limitation to the period during which the lathe was damaged.

## II.

## FAIR OPPORTUNITY TO OPT FOR A HIGHER LIABILITY LIMIT

Mori Seiki argues that the district court erred by concluding on summary judgment that COGSA's $500 package liability limit should not apply to this case because the shipper, Mori Seiki Japan, Inc., was not afforded a "fair opportunity" to declare a higher value for the cargo. We disagree.

■ Under Ninth Circuit law, a carrier may take advantage of COGSA's $500 liability limit only if it gives the shipper a "fair opportunity" to opt for a higher liability by paying a correspondingly higher freight rate. *Carman Tool & Abrasives, Inc. v. Evergreen Lines*, 871 F.2d 897, 899 (9th Cir.1989); *Komatsu, Ltd. v. States S.S. Co.*, 674 F.2d 806, 809 (9th Cir.1982); *Tessler Bros. (B.C.) Ltd. v. Italpacific Line*, 494 F.2d 438, 443 (9th Cir.1974). As we have explained in the past, "[t]he fair opportunity requirement is meant to give the shipper notice of the legal conse-

quences of failing to opt for an ad valorem freight rate." *Carman Tool*, 871 F.2d at 899.

■ In a dispute over "fair opportunity" such as this one, the carrier bears an initial burden of producing prima facie evidence which demonstrates that it provided such notice to the shipper. *Carman Tool*, 871 F.2d at 899. "Normally, the carrier can meet this initial burden by showing that the language of COGSA Section 4(5) [liability limitation] is contained in the bill of lading." *Nemeth v. General S.S. Corp., Ltd.*, 694 F.2d 609, 611 (9th Cir.1982). Language in the bill of lading "to the same effect" as the statute is adequate. *Pan American World Airways, Inc. v. California Stevedore & Ballast Co.*, 559 F.2d 1173, 1176 (9th Cir.1977). On the other hand, the mere incorporation of COGSA by reference is not adequate. *Komatsu*, 674 F.2d at 809–10. Once the carrier meets this initial burden, "the burden of disproving fair opportunity [shifts] to the shipper." *Carman Tool*, 871 F.2d at 899.

The district court concluded that the language contained in the bill of lading tracked the language of the statute and therefore satisfied the carrier's initial burden of proving "fair opportunity." Mori Seiki does not challenge the adequacy of the language, but offers three other reasons why the bill of lading did not satisfy Mitsui's initial burden: (1) the warning of the liability limitation did not appear on the front page of the bill of lading, (2) there was no space on the bill of lading to insert a higher value for the shipment, and (3) the language was printed in illegibly small print. We find none of these arguments persuasive.

■ First, Mori Seiki does not cite any Ninth Circuit case which requires that a warning regarding COGSA's liability limitation appear on the *front* page of a bill of lading. The district court observed that

although "some judicial opinions in this areas have referred to the 'face of the bill of lading,' no technical rule of law is established by this convenient turn of phrase." We agree. The carrier's initial burden is satisfied as long as the appropriate language appears "*in* the bill of lading." *Carman Tool*, 871 F.2d at 899 (emphasis added); *see also Komatsu*, 674 F.2d at 809.

■ Second, Mori Seiki does not cite any Ninth Circuit case which requires that a bill of lading include a space for the shipper to declare a higher liability limit and concedes that no such case exists. Mori Seiki cites two cases in which we noted the provision of such a space, and invites us to hold that such a space is mandatory. *Carman Tool*, 871 F.2d at 899–900; *London Underwriters*, 881 F.2d at 766. We decline the invitation. We note that in at least one other case we found that the carrier's burden had been met without reference to whether such a space had been provided. *See Tessler*, 494 F.2d at 443.

■ Third, Mori Seiki's legibility argument also fails. In *Nemeth*, this court held that an "illegible recitation" of the COGSA liability limitation would not provide adequate notice and therefore would not constitute prima facie evidence of a fair opportunity. 694 F.2d at 611–12. Accordingly, the court found that a bill of lading did not provide adequate notice where the copy included in the district court record was "microscopic and blurry" and "illegible to the unaided eye." *Id.* at 611. In this case, the district court found that although the print of the bill of lading is "fine," it can be read with the naked eye, and was therefore adequate for purposes of fair opportunity. We agree.[1]

Finally, Mori Seiki argues that these alleged defects, considered cumulatively, disqualify the bill of lading as prima facie evidence establishing fair opportunity. Be-

---

1. Mori Seiki cites a recent case in which the Second Circuit Court of Appeals compared the precise size of standard typeface, in lines per inch, with the size of typeface used in a bill of lading. *Monica Textile Corp. v. S.S. Tana*, 952 F.2d 636, 641 n. 3 (2d Cir.1991). Mori Seiki

suggests that the typeface in the present bill of lading is just as small when judged in lines per inch. We decline, however, to adopt such a strict and technical approach to assessing legibility.

cause we find that none of them actually constitutes a defect, this argument also fails. We believe Mitsui met its initial burden by establishing prima facie evidence of fair opportunity. The burden having shifted, we subsequently find that Mori Seiki has failed to provide any specific evidence that it was denied such an opportunity.

We therefore conclude that the district court properly granted summary judgment in favor of appellees on the issue of whether Mori Seiki was offered a fair opportunity to opt out of the $500 liability limitation.

### III.

### EXTENSION OF COGSA'S PACKAGE LIABILITY LIMITATION TO MARINE TERMINALS CORPORATION UNDER THE HIMALAYA CLAUSE

█ Mitsui's bill of lading included a so-called "Himalaya clause," which is commonly used to extend a carrier's defenses and liability limitations to certain third parties performing services on its behalf. *See, e.g., Taisho Marine & Fire Ins. Co., Ltd. v. Vessel Gladiolus,* 762 F.2d 1364, 1366 (9th Cir.1985). The district court concluded that Trans Pacific Container Corporation ("TRA–PAC"), the seaport operator, and Marine Terminals Corporation ("MTC"), the stevedore services company, were covered by the Himalaya clause in Mitsui's bill of lading and were therefore entitled to enjoy the $500 package liability limit. Mori Seiki does not dispute the court's conclusion with respect to TRA–PAC, but does appeal with respect to MTC.

The Himalaya clause, which is found in Section 5 of the bill of lading, reads in relevant part:

> The Carrier shall be entitled to sub-contract on any terms the whole or any part of the handling, storage or carriage of the Goods and any and all duties whatsoever undertaken by the Carrier in relation to the Goods.... [E]very such servant, agent and subcontractor shall have the benefit of all provisions herein for the benefit of the Carrier as if such provisions were expressly for their benefit....

Mori Seiki argues that MTC is not entitled to the carrier's liability limitation under this clause because MTC was a subcontractor of TRA–PAC, not of Mitsui.

In *Tessler,* we held that "[w]hether a bill of lading extends limitations of liability to stevedores depends on whether 'the clarity of the language used expresses such to be the understanding of the contracting parties.'" 494 F.2d at 446 (quoting *Robert C. Herd & Co. v. Krawill Machinery Corp.,* 359 U.S. 297, 305, 79 S.Ct. 766, 771, 3 L.Ed.2d 820 (1959)). In *Taisho Marine,* we stated further that:

> Whether an entity is an intended beneficiary of a Himalaya Clause depends upon the contractual relation between the party seeking protection and the ocean carrier, as well as the nature of the services performed compared to the carrier's responsibilities under the carriage contract.

762 F.2d at 1367.

█ There is no question that MTC's unloading of the Alligator Triumph was directly related to the carrier's responsibilities under the carriage contract. There is a question, however, regarding the contractual relationship between Mitsui and MTC. The district court resolved this question by concluding that TRA–PAC was acting as an agent for Mitsui when TRA–PAC hired MTC and that Mitsui was therefore a party to the contract with MTC. On this basis, the district court concluded that MTC was entitled to the $500 package liability limitation under the Himalaya clause. We agree.

"The Restatement (Second) of Agency has been adopted in maritime law as an accurate statement of applicable general agency principles." *Stevens Technical Services, Inc. v. SS BROOKLYN,* 885 F.2d 584, 589 (9th Cir.1989). According to Restatement (Second) of Agency § 1(1) (1958): "Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act."

In support of its conclusion that TRA–PAC was acting on behalf of Mitsui when it hired MTC, the district court found that the stevedore service agreement applied only

to Mitsui vessels, that MTC held a maritime lien against Mitsui and its vessels for services rendered, and that MTC invoiced Mitsui, in care of TRA–PAC, for the services of unloading the ALLIGATOR TRIUMPH. In support of its conclusion that TRA–PAC was under the control of Mitsui, the district found, in part, that TRA–PAC was 90% owned by Mitsui and 10% owned by Mitsui's local steamship agent, that several of TRA–PAC's key employees were really Mitsui employees who were on loan to TRA–PAC, and that TRA–PAC performed services for no other carrier but Mitsui at that time.

"Issues regarding agency are generally treated as fact issues," *N.L.R.B. v. Donkin's Inn, Inc.,* 532 F.2d 138, 141 (9th Cir.), *cert. denied,* 429 U.S. 895, 97 S.Ct. 257, 50 L.Ed.2d 179 (1976), and are therefore reviewed for clear error. *C–ART,* 940 F.2d at 534. We find that the district court's conclusions were amply supported and that Mori Seiki has failed to demonstrate that they were clearly erroneous.[2] We conclude, therefore, that the Himalaya clause extended Mitsui's COGSA defenses, including the $500 package liability limitation, to MTC.

### IV.

### CONCLUSION

For the foregoing reasons we conclude that both the district court's summary judgment and trial orders were proper.

**AFFIRMED.**

**2.** Mori Seiki argues that Mitsui, TRA–PAC and MTC admitted in their pleadings that Mitsui and TRA–PAC were not in a direct contractual relationship. Stipulations and admissions which are expressly made in pleadings are generally binding on the parties, the trial court, and the appellate court. *American Title Ins. Co. v. Lacelaw Corp.,* 861 F.2d 224, 226 (9th Cir.1988). We are not persuaded, however, that the parties made such an admission in this case. In one passage cited by Mori Seiki, TRA–PAC and MTC allege that the indemnity provisions contained in the stevedore service agreement are not appli-

cable to Mitsui. In the rest of the cited passages, the parties acknowledge that TRA–PAC entered a stevedore service agreement with MTC. None of these passages expressly denies, or otherwise precludes the district court's conclusion that TRA–PAC was acting as Mitsui's agent and that Mitsui was therefore a party to the contract.