123 F.3d 1287
 1997 A.M.C. 2713, 97 Cal. Daily Op. Serv. 7012,
97 Daily Journal D.A.R. 11,355
 Benny CHAN and; Victoria Chan, as Guardian Ad Litem of
Samantha Chan, Plaintiffs-Appellees,
and
Adventurer Cruises, Inc., a Liberian corporation, Claimant,
v.
SOCIETY EXPEDITIONS, INC., a Washington Corporation,
Discoverer Reederei, GmbH, a West German
corporation, in personam, Defendants-Appellants.
Benny CHAN and Victoria Chan, individually, and as husband
and wife, Victoria Chan, as Guardian Ad litem for
Samantha Chan, Plaintiffs-Appellants,
v.
SOCIETY EXPEDITIONS, INC., a Washington Corporation, et al.,
Defendants,
and
World Discoverer, Claimant-Appellee.
 Nos. 96-35210, 96-35372.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted May 29, 1997.
Decided Aug. 29, 1997.
 
 Thomas F. Paul, Le Gross, Buchanan and Paul, Seattle, WA, for defendants-appellants/cross-appellees.
 Donovan R. Flora, Sullivan and Golden, Seattle, WA, for plaintiffs-appellees/cross-appellants.
 Appeal from the United States District Court for the Western District of Washington; Thomas S. Zilly, District Judge, Presiding. D.C. No. CV 90-01055-TSZ.
 Before: GOODWIN, SCHROEDER, and NORRIS, Circuit Judges.
 GOODWIN, Circuit Judge:
 
 
 1
 Defendants Society Expeditions ("Society") and Discoverer Reederei GmbH ("Discoverer") appeal the district court's ruling that they are liable for injuries Plaintiffs Benny and Samantha Chan sustained when an inflatable raft on which they were ferried from a cruise ship to shore capsized in the South Pacific. The Chans cross-appeal the district court's dismissal of their action in rem against the cruise ship WORLD DISCOVERER and the court's ruling that Liberian law, the law of the ship's flag, applies to limit their recoverable damages.
 
 
 2
 This appeal forces us to consider the obligations and duties that arise from a contract of carriage embodied in a cruise ship passenger ticket. We must also determine the enforceability of terms drafted by the carrier and contained in the ticket. We affirm in part, reverse in part, and remand for further proceedings.
 
 FACTS AND PROCEDURAL HISTORY
 
 3
 Benny and Victoria Chan booked passage for themselves and their seven-year-old daughter, Samantha, on the cruise ship, WORLD DISCOVERER. The ship is operated by Discoverer Reederei, a German company. Benny Chan's employer, Society Expeditions, Inc., a Washington corporation which is in the business of marketing and chartering cruise ships, chartered the WORLD DISCOVERER for the cruise at issue. Heiko Klein, a German citizen, is the sole shareholder, chairman, and president of Society Expeditions. At the time of the relevant events, Klein was also the president and sole owner of Adventurer,[1] the Liberian company that owned the WORLD DISCOVERER, and the sole owner of Discoverer Reederei. The officers and crew of the ship were employees of Columbia Shipmanagement Ltd. ("Columbia"), a Cypriot crewing company.[2]
 
 
 4
 The Chans boarded the ship in Tahiti on March 30, 1990. The next day, passengers were ferried by an inflatable raft called a Zodiac to Makatea, a coral atoll in French Polynesia that was the first stop on the day's travel itinerary. The driver of the Zodiac on which the Chans were transported was Marcelino Tavita, a crew member and employee of Columbia. While ferrying the last group of passengers ashore, the raft turned broadside to a wave and capsized. The passengers were thrown into the surf. Tavita and one passenger died in the accident. Benny Chan sustained severe brain and head injuries and Samantha Chan sustained both physical and emotional injuries.
 
 
 5
 The district court initially granted Society's motion for summary judgment on the ground that the employer was immune from tort liability under Washington state workers' compensation law and granted Discoverer's motion to dismiss for lack of personal jurisdiction. We reversed those rulings and remanded for further proceedings. See Chan v. Society Expeditions, Inc., 39 F.3d 1398, 1410 (9th Cir.1994).
 
 
 6
 On remand, the district court tried only the issue of liability, reserving the determination of damages until after this appeal.[3] The court dismissed the in rem action against the ship and held that Liberian law applied to the case to limit the Chans' damages. The court found that Tavita's negligent driving caused the capsizing of the Zodiac and found both Society and Discoverer liable for the Chans' injuries. Both parties timely appealed the respective rulings.
 
 I. THE APPEAL
 A. Standard of Review
 
 7
 The parties dispute which aspects of the trial court's holdings involve determinations of fact entitled to deference. See Exxon Co. v. Sofec, Inc., 54 F.3d 570, 576 (9th Cir.1995) (factual findings of a district court sitting in admiralty are reviewed for clear error), aff'd, 517 U.S. 830, 116 S.Ct. 1813, 135 L.Ed.2d 113 (1996). While the determination of liability in admiralty is a question of law reviewed de novo, see Howard v. Crystal Cruises, Inc., 41 F.3d 527, 529 (9th Cir.1994), the district court's determination of negligence in an admiralty case is a finding of fact. See Exxon, 54 F.3d at 576.
 
 
 8
 We have also labeled as factfinding an admiralty court's determination that a party conducted itself as an entity charged with particular legal obligations under admiralty law. For example, we reviewed for clear error a district court's determination that the plaintiff shipped goods by sea as an "independent seller" rather than as a "buying agent." See C-ART, Ltd. v. Hong Kong Islands Line Am., S.A., 940 F.2d 530, 534 (9th Cir.1991). We also review for clear error the determination that a party is a "carrier" within the meaning of the Carriage of Goods by Sea Act (COGSA). See Mori Seiki USA, Inc. v. M.V. Alligator Triumph, 990 F.2d 444, 450-51 (9th Cir.1993); Pacific Employers Ins. Co. v. The M/V Gloria, 767 F.2d 229, 234-35 (5th Cir.1985).
 
 
 9
 Similarly, the district court's characterization of Society as a carrier and Discoverer as an operator/owner in this case constitutes factfinding entitled to appellate review under the clearly erroneous standard. Our review of these findings is thus "significantly deferential, requiring a definite and firm conviction that a mistake has been committed" before we will reverse. See Exxon, 54 F.3d at 576 (internal quotation omitted).
 
 B. Society's Liability
 
 10
 We have long recognized that the carrier-passenger relationship, as established in the contract of carriage, yields significant legal consequences. We have held that " 'by the sale of the ticket there [arises] a contractual relationship between the company and the passenger, to which relationship the law by its own force annexe[s] certain implied obligations and duties.' " Morton v. De Oliveira, 984 F.2d 289, 290 (9th Cir.1993) (quoting Pacific S.S. Co. v. Sutton, 7 F.2d 579, 580 (9th Cir.1925)).
 
 
 11
 The contract of carriage imposes a duty on the carrier to transport passengers safely, see id., and to exercise reasonable care under the circumstances of each case. See Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 632, 79 S.Ct. 406, 410, 3 L.Ed.2d 550 (1959); Keefe v. Bahama Cruise Line, Inc., 867 F.2d 1318, 1321 (11th Cir.1989). We have held that in discharging this duty of reasonable care, a carrier of passengers "must maintain a reasonable, safe means for a passenger to disembark" and must "render such services as are reasonably necessary to get a passenger safely ashore." Marshall v. Westfal-Larsen & Co., 259 F.2d 575, 577 (9th Cir.1958).
 
 
 12
 Although these cases generally involve defendants who are both the shipowner and the carrier, the principles of carrier liability are not limited to shipowners. Because the carrier's duties are born from the contractual relationship with the passenger, they apply with equal force to non-owners. See Stanga v. McCormick Shipping Corp., 268 F.2d 544, 551 (5th Cir.1959) ("[I]t is the contract of carriage as a water-borne passenger which gives rise to the high degree of care exacted of a carrier of passengers...."). Thus, if, as the district court found, Society held itself out and conducted itself as a carrier of passengers, it owed the Chans a duty to transport them safely from the cruise ship to shore.
 
 
 13
 We find ample support in the record for the district court's finding that Society represented itself as a carrier and assumed the duties of a carrier for the Chans' cruise. First, the charter agreement entered into between Adventurer, the shipowner, and Society provides that Society must "issue to passengers the Owners' standard form of ticket as per Schedule II ... and shall embody the same in any contract of carriage with the passengers." The Schedule II form ticket describes the carrier's and the passenger's duties and responsibilities. The "Contract of Carriage" Society issued to passengers tracks the language of Schedule II almost identically, but substitutes the name "Society" for each instance of the term "Carrier" in Schedule II.
 
 
 14
 Second, Society is the only company mentioned by name in the contract of carriage, which constitutes the passenger's ticket. The contract of carriage defines the term "Society" to include "the Ship, its owner, its operator or charterer, all affiliated companies and the sales representatives and all employees of such individuals and companies." This contract of carriage is the only document the passenger is required to sign with any party involved in the cruise. In issuing this contract of carriage in its own name, Society was holding itself out as the carrier and embodying its willingness to be seen by passengers as the carrier for purposes of this cruise.
 
 
 15
 Society contends that, despite this evidence, it acted merely as an agent for the other service providers involved in the Chans' cruise. Citing Lavine v. General Mills, Inc., 519 F.Supp. 332 (N.D.Ga.1981), and Weade v. Dichmann, Wright & Pugh, Inc., 337 U.S. 801, 69 S.Ct. 1326, 93 L.Ed. 1704 (1949), Society argues that its participation in the cruise was minimal and did not rise to the level of a carrier. These cases are distinguishable, however. Lavine involved a package tour to Australia and New Zealand arranged by the defendant which included a separate, optional cruise to Fiji on which the plaintiff was injured. See Lavine, 519 F.Supp. at 334. There was no evidence that the defendant travel agent signed a contract of carriage or represented itself as the carrier for the cruise, which included many passengers unrelated to the package tour and which was owned and operated by a separate cruise company. See id. While the Supreme Court held in Weade that an agent who issued tickets, maintained the vessel, arranged for the loading and unloading of passengers, directed advertising, provisioned the ship, and procured the crew was not a common carrier, see Weade, 337 U.S. at 805, 69 S.Ct. at 1328 the defendant signed the passenger ticket it issued explicitly as an agent and did not carry out the "actual movement of ... passengers." See id. at 807-08, 69 S.Ct. at 1328-29. In contrast, Society represented itself as the carrier, not as an agent, on the passenger ticket it issued to the Chans.
 
 
 16
 Moreover, in addition to the ship's captain, Society directed and controlled the Zodiac boat landings for the Chans' cruise. Its travel brochure trumpeted its use of the "swift, go-everywhere" Zodiac landing craft that are "The Key to Expedition Cruising." The tour materials issued by Society advertised the Zodiac's versatility and safety in the hands of Society's "highly-skilled boatmen" and described the Zodiacs as a unique feature of a Society Expeditions cruise. According to testimony presented to the district court, ornithologists, marine biologists, and nature experts hired by Society to lead expeditions on the islands also ferried passengers to shore in the Zodiacs. Members of Society's office staff selected Zodiac drivers based on resumes they received and ensured that drivers were trained to pilot the crafts. Expedition leaders, who are Society employees, conducted a safety briefing for passengers on Zodiac travel.
 
 
 17
 On the day of the accident involving the Chans, three Society employees, unaccompanied by any officers or members of the ship's crew, scouted out the sea conditions and landing site and established the landing route for the boats. Because Peter Harrison, a Society-employed ornithologist and Zodiac driver, was on shore leading a bird-watching talk, the expedition leader selected Tavita as an alternative driver from the ship's crew. All Zodiacs that transported passengers other than the one in which the Chans were sailing that day were piloted by Society employees. Furthermore, Society employees conducted the rescue operation when the Zodiac piloted by Tavita overturned.
 
 
 18
 Society contends that its disclaimer establishes its status as an agent and absolves it of all responsibility for personal injuries. Society points to the language in its travel brochure which states, "[Society] acts only as an agent for the suppliers and contractors providing air or other transportation, and hotel, sightseeing and other shoreside services and assumes no responsibility however caused, for your personal injury, personal or property loss or damage in connection with any service." This language is not an effective general disclaimer of all liability for the cruise, however. First, the clause representing Society as an agent modifies the language describing shoreside services and sightseeing and the transportation and accommodations associated with those activities. Second, the force majeure clause that follows this sentence would be mere surplusage if the initial sentence were a general disclaimer of Society's responsibility for all aspects of the cruise.
 
 
 19
 Cruise passenger tickets are contracts of adhesion, and as such, ambiguities in them must be construed against the carrier. See Rams v. Royal Caribbean Cruise Lines, Inc., 17 F.3d 11, 12-13 (1st Cir.1994); Lousararian v. Royal Caribbean Corp., 951 F.2d 7, 8 (1st Cir.1991). Thus, we decline to interpret this ambiguous language as an effective general disclaimer of Society's liability.
 
 
 20
 Alternatively, Society argues that even if this term does not constitute a general disclaimer, the Zodiac trips were shore excursions for which it specifically disclaimed its liability through this same language in the travel brochure. Society's argument is essentially that even if it were a carrier, the Zodiac landings were outside its sphere of responsibility.
 
 
 21
 While the disclaimer may have effectively absolved Society of liability for true shoreside frolics, admiralty law has generally prohibited carriers from limiting their liability for transporting passengers from ship to shore. See 1 Martin J. Norris, The Law of Maritime Personal Injuries § 3:6, 3:16 at 66-67, 81-83 (4th ed.1990) (where a vessel cannot tie up to a dock and tenders or launches are used, carrier must maintain a reasonably safe means of transport from the vessel to shore). "[C]ontract provision[s] relieving the carrier of liability to a cruise ship passenger for injuries occurring while in a tender or launch operating between the ship and shore" are likely void as violations of public policy. Id. at 66-67.
 
 
 22
 We have held that there is a "long-established rule that embarking and disembarking are a part of the voyage which the shipowner agrees to provide." Isham v. Pacific Far East Line, Inc., 476 F.2d 835, 836 (9th Cir.1973). "Where a passenger or cruise vessel puts into numerous ports in the course of the cruise, these stopovers are the sine qua non of the cruise. In such a situation, the shipowner has a duty to exercise a high degree of care in seeing to the safe embarking and disembarking of the passengers." Id. at 837. Isham relied for this proposition on Lawlor v. Incres Nassau S.S. Line, Inc., 161 F.Supp. 764, 767 (D.Mass.1958), which aptly stated that
 
 
 23
 an attempt on the part of the carrier to ... limit himself to protecting the passenger only while he is on the vessel is repugnant to the essence of the voyage. One of the principal purposes of the trip is for the passenger to go ashore at Caribbean ports. It would never occur to the average passenger that the carrier was not undertaking any responsibility for landing him or bringing him back to the vessel.
 
 
 24
 Society's attempt to characterize the Zodiac landings as shore excursions thus fails. Society's own travel brochure characterizes "Expedition Stops" as an integral part of the cruise. If Society is liable for passenger injuries as a carrier, it is liable for injuries sustained during Zodiac transport from ship to shore.
 
 
 25
 Society's strongest argument is that it cannot be held liable because it was merely the time charterer for the cruise. In the context of injuries to crew members, we have noted that "[u]nder traditional admiralty principles an injured seaman cannot sue a time charterer unless the seaman can show either the time charterer had enough control of the vessel to render it the owner pro hac vice or the time charterer was actively negligent." Alexander v. United States, 63 F.3d 820, 822 (9th Cir.1995) (citation omitted), cert. denied, 517 U.S. 1188, 116 S.Ct. 1674, 134 L.Ed.2d 778 (1996). Society claims that because Adventurer, the shipowner, retained responsibility for operational and navigational decisions under the terms of the charter, Society did not have enough control to render it liable as an owner pro hac vice or a demise charterer. See Forrester v. Ocean Marine Indem. Co., 11 F.3d 1213, 1215 (5th Cir.1993) ("In a demise charter, the vessel owner transfers full possession and control to the charterer.... Consequently, the ... demise charterer is the owner pro hac vice of the vessel for the duration of the contract.")
 
 
 26
 Society cannot, however, escape the duties imposed by its contractual relationship with the Chans by hiding behind its charter agreement with Adventurer. The cases Society cites analyzing the amount of control the charterer has ceded generally do not involve carriage of passengers. One exception is Stafford v. Intrav, Inc., 841 F.Supp. 284 (E.D.Mo.1993), aff'd, 16 F.3d 1228 (8th Cir.1994), in which the court held that a defendant who arranged a package tour including a cruise on Dutch inland waterways could not be held liable for the injuries of a tour participant who fell from a platform on the cruise ship. In contrast to this case, the Stafford court expressly held that the tour operator "was not a common carrier" and had not issued a contract of carriage. Id. at 287. Society's liability stems not from its role as charterer and the attendant liability admiralty law places on certain types of charterers, but from its role as carrier and the duties imposed on carriers by traditional contract principles.
 
 
 27
 Moreover, even a time charterer may be liable where it undertakes operating functions on the vessel or has a right or ability to control the actions of the crew. See Alexander, 63 F.3d at 822; Turner v. Japan Lines, Ltd., 651 F.2d 1300, 1304-06 (9th Cir.1981). Society's control over and active participation in the Zodiac landing operations establishes that, at least as to the landings, Society assumed a role greater than that of a traditional time charterer.
 
 
 28
 We conclude that, as the carrier for the Chans' cruise, Society owed a duty to transport the passengers with reasonable care from ship to shore. The defendants do not contest the district court's finding that Tavita's piloting of the Chans' Zodiac fell below that standard of care and was therefore negligent. Because Society was responsible for the movement of passengers to and from the ship, we affirm the district court's ruling that Society was liable for the injuries the Chans sustained in the Zodiac accident.
 
 C. Discoverer's Liability
 
 29
 The district court found Discoverer liable under two alternative theories. First, it found that because Discoverer was the operator of the ship, it could be held liable for the Chans' injuries. Second, it pierced the corporate veil between Discoverer, Adventurer, and Society to hold Discoverer liable as an owner of the ship. We consider these holdings in turn.
 
 
 30
 The operator of a ship may be held liable for injuries sustained by passengers on the vessel. See 1 Thomas J. Schoenbaum, Admiralty and Maritime Law § 5-5, at 172 (2d ed.1994). However, mere "brokers or agents who issue the ticket or manage the ship for a disclosed principal" are not proper defendants in a passenger case. Id.; see also Haffel v. United States Lines Co., 114 F.Supp. 443, 444 (S.D.N.Y.1953).
 
 
 31
 Discoverer contends that it was only the managing agent for the cruise, and as such, may not be held liable for the Chans' injuries. See Weade, 337 U.S. at 805, 69 S.Ct. at 1328 (non-liable agents' duties included issuing tickets, maintaining vessel, maintaining terminals and offices, arranging for loading and unloading of passengers, arranging advertising, provisioning ship, and procuring officers and crew). The record supports the district court's finding, however, that although Discoverer acted as a traditional managing agent, it also performed tasks akin to that of an operator and held itself out as the operator of the ship.
 
 
 32
 The ship's captain testified that he directed his questions regarding the operation of the ship to Discoverer. Captain Lampe also filed an accident report after the incident listing Discoverer as the owner of the ship. While the captain testified that this designation was a mistake "from [his] present point of view," the district court was entitled to discount this post hoc rationalization in its role as factfinder. The typed sheet entitled "Landing Procedures by Rubber Boats" distributed to passengers on the ship was labeled with the name "Discoverer Reederei GmbH." In its briefs to this court in the prior Chan appeal, Discoverer characterized itself as the "operator" of the vessel.
 
 
 33
 Given this support in the record, we cannot conclude that the district court clearly erred in holding that Discoverer was the operator of the ship. We therefore affirm the court's ruling that Discoverer is liable as the ship's operator for the Chans' injuries.
 
 
 34
 More problematic is the district court's holding that Discover is also liable as the owner of the vessel. Admiralty courts may pierce the corporate veil in order to reach the "alter egos" of a corporate defendant. See Swift & Co. Packers v. Compania Colombiana Del Caribe, S A, 339 U.S. 684, 689 n. 4, 70 S.Ct. 861, 865 n. 4, 94 L.Ed. 1206 (1950); see also Talen's Landing, Inc. v. M/V Venture, 656 F.2d 1157, 1160 (5th Cir.1981). Federal courts sitting in admiralty generally apply federal common law when examining corporate identity. See In re Holborn Oil Trading Ltd., 774 F.Supp. 840, 844 (S.D.N.Y.1991). "Corporate separateness is respected unless doing so would work injustice upon an innocent third party." Kilkenny v. Arco Marine Inc., 800 F.2d 853, 859 (9th Cir.1986).
 
 
 35
 We have held that disregard of corporate separateness "requires that the controlling corporate entity exercise total domination of the subservient corporation, to the extent that the subservient corporation manifests no separate corporate interests of its own." Id. (internal quotations omitted). As formulated by the Second Circuit, federal common law allows piercing of the corporate veil where a corporation uses its alter ego to perpetrate a fraud or where it so dominates and disregards its alter ego's corporate form that the alter ego was actually carrying on the controlling corporation's business instead of its own. See Kirno Hill Corp. v. Holt, 618 F.2d 982, 985 (2d Cir.1980).
 
 
 36
 The record is not sufficient to support the district court's decision to pierce the corporate veil in this case. See Teixeira v. Van Camp Seafood Co., 783 F.2d 951, 953 (9th Cir.1986); Kilkenny, 800 F.2d at 859. Aside from the common ownership of these three corporations by Heiko Klein, no other evidence presented at trial demonstrated a shared corporate existence or common scheme to perpetrate fraud on third parties. Common ownership alone is insufficient to support disregard of the corporate form. See United States v. Jon-T Chems., Inc., 768 F.2d 686, 691 (5th Cir.1985). We therefore reverse the district court's ruling that Discoverer was liable as an owner for the Chans' injuries.
 
 II. THE CROSS-APPEAL
 A. Dismissal of the In Rem Action[4]
 
 37
 The district court dismissed the Chans' in rem action against the vessel WORLD DISCOVERER because they failed to file it within the one-year limitations period contained in the contract of carriage. The Chans contend that this bar is fundamentally unfair because they could not file a verified complaint as required by Supplemental Admiralty and Maritime Rule C(2) within the limitations period. We agree and thus reverse the district court's dismissal of their claim.
 
 
 38
 Rule C(2) requires a plaintiff filing a complaint in actions in rem to state that the vessel "is within the district or will be during the pendency of the action." Fed.R.Civ.P. C(2); see also United States v. Argent Chem. Labs., Inc., 93 F.3d 572, 574 (9th Cir.1996), cert. denied, 520 U.S. 1115, 117 S.Ct. 1244, 137 L.Ed.2d 326 (1997). We have stated that in signing a verified complaint, the signator "must 'satisfy himself that the averments in the complaint are true, based upon either his own knowledge or upon information and belief.' " United States v. $191,910 in U.S. Currency, 16 F.3d 1051, 1068 (9th Cir.1994) (quoting 7A Moore's Federal Practice p B.09, at B-402 (1988)).
 
 
 39
 Several courts have dismissed in rem actions for failure to verify the complaint pursuant to Rule C(2). See, e.g., Gulf Union Ins. Co. Saudi Arabia v. M/V Lacerta, 1992 WL 51532, at * 4 (S.D.N.Y. Mar. 9, 1992); CTC Imports & Exports v. Nigerian Petroleum Corp., 739 F.Supp. 966, 968 (E.D.Pa.1990). A number of courts have also held that an unsupported allegation that a vessel will be present in the district is insufficient to retain in rem jurisdiction. See, e.g., Vanol USA, Inc. v. M/T Coronado, 663 F.Supp. 79, 82 (S.D.N.Y.1987); Excel Shipping Corp. v. Seatrain Int'l S.A., 584 F.Supp. 734, 746 (E.D.N.Y.1984).
 
 
 40
 The Chans assert that they did not know when the WORLD DISCOVERER might be within the jurisdiction of Washington, where they had contractually agreed to file any suit against the ship, and thus they could not have filed a complaint meeting the requirements of Rule C(2) within the limitations period.[5] The contractual forum selection clause, they argue, thus conflicts with the contractual limitations clause, forcing them to make an impossible and unjust choice between the two clauses.
 
 
 41
 The defendants argue that the Chans should have filed a complaint stating that the ship would be in the jurisdiction and then requested that the arrest of the vessel be held "in abeyance," pursuant to Supplemental Admiralty and Maritime Rule E(3)(b), until the ship arrived in the jurisdiction. This would have forced the Chans to file a complaint that violated the verified complaint rule, however, because they could not attest that the ship would enter Washington waters during the pendency of the suit. Moreover, some courts have held that plaintiffs must show that the vessel will be within the jurisdiction "shortly" in order to justify holding process in abeyance pursuant to Rule E(3)(b). See, e.g., Norfolk Shipbuilding & Drydock Corp. v. USNS Truckee, 629 F.Supp. 779, 781 (E.D.Va.1985). The defendants would no doubt have moved to dismiss on these grounds, arguing that the ship had no plans to sail to Washington in the foreseeable future.
 
 
 42
 The defendants also argue that the Chans could have filed in a jurisdiction in which the vessel could be found within the limitations period and requested that the action be transferred to Washington. See Continental Grain Co. v. Barge FBL-585, 364 U.S. 19, 22-27, 80 S.Ct. 1470, 1472-75, 4 L.Ed.2d 1540 (1960); Internatio-Rotterdam, Inc. v. Thomsen, 218 F.2d 514, 515-17 (4th Cir.1955). This would have forced the Chans to disregard the contractual forum selection clause, however. In addition, if the vessel could be found only in a foreign jurisdiction during the one-year period (as turned out to be the case here), a dismissal of the complaint without prejudice by a foreign court, in deference to the forum selection clause, would not toll the limitations period. See Fugaro v. Royal Caribbean Cruises, Ltd., 851 F.Supp. 122, 125 n. 2 (S.D.N.Y.1994).
 
 
 43
 In Carnival Cruise Lines, Inc. v. Shute, 499 U.S. 585, 593-95, 111 S.Ct. 1522, 1527-28, 113 L.Ed.2d 622 (1991), the Supreme Court held that although forum selection clauses in passenger tickets are not automatically invalid, courts must examine such provisions to determine if they are unreasonable or fundamentally unfair. We have applied this test in the context of contractual limitations periods in passenger cruise tickets. See Dempsey v. Norwegian Cruise Line, 972 F.2d 998, 999 (9th Cir.1992).
 
 
 44
 Unlike the plaintiff in Dempsey, who failed to present evidence that the limitations provision at issue met this standard, see id., the Chans have presented compelling arguments in this case that the contractual limitations period included in their passenger ticket is so unfair, when coupled with the verified complaint requirement of Rule C(2) and the contractual forum selection clause, that they should be relieved of its constraints. We conclude that the limitations period is fundamentally unfair, see Carnival Cruise, 499 U.S. at 595, 111 S.Ct. at 1528 and therefore reverse the district court's dismissal of the Chans' action in rem against the vessel.
 
 B. Choice of Law
 
 45
 We next consider the district court's ruling that because the WORLD DISCOVERER was flagged in Liberia, Liberian law governs the Chans' action despite the presence of a contractual choice-of-law clause in the passenger ticket which specified that United States law would apply. While in most other respects Liberia applies United States maritime law, it has ratified the Athens Convention, which limits recoverable damages in passenger injury cases to approximately $70,000. Both parties concede that Benny Chan's damages alone would far exceed this limit. The United States has not acceded to or ratified the Athens Convention and the Convention's damage limitations therefore do not apply to actions under United States maritime law. See Schoenbaum § 5-5, at 168. We conclude that the district court erred in its choice-of-law analysis and thus reverse the court's ruling.
 
 
 46
 The contract of carriage the defendants issued to the Chans included a choice-of-law provision in paragraph 18, which specified that the "Ticket and all other rights and duties of Passengers and of Society will be construed in accordance with the general maritime law of the United States." Paragraph 15 states that "nothing in this Ticket is intended to nor shall operate to limit or deprive Society of any such statutory limitation of or exoneration from liability, or of the benefits of any statute or law of any country which might be applicable providing for exoneration from or limitation of liability." The defendants claim that paragraph 15 is an exception to paragraph 18's choice clause and would allow any country's laws to govern.
 
 
 47
 We find the defendants' interpretation unpersuasive. First, paragraph 18 is clearly identified as the contract's choice-of-law clause. Second, paragraph 18 is a specific clause choosing United States law to govern the parties rights and duties arising from the passenger ticket. Paragraph 15, in contrast, is a general provision claiming the defendants' potential rights to take advantage of "any statute or law of any country which might be applicable." Under well-settled contract principles, specific provisions control over more general terms. See Brinderson-Newberg Joint Venture v. Pacific Erectors, Inc., 971 F.2d 272, 279 (9th Cir.1992) (citing Restatement (Second) of Contracts § 236(c) (1932)). Finally, at most, paragraph 15 creates some ambiguity about the scope of paragraph 18's choice clause. We "construe ambiguous language against the interest of the party that drafted it." Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 62, 115 S.Ct. 1212, 1218, 131 L.Ed.2d 76 (1995); see also Rams, 17 F.3d at 13. If the defendants drafted an ambiguous document, "they cannot now claim the benefit of the doubt." Mastrobuono, 514 U.S. at 63, 115 S.Ct. at 1219. Thus, the choice clause in paragraph 18 specifying the application of United States law governs the Chans' claims.
 
 
 48
 In the absence of a contractual choice-of-law clause, federal courts sitting in admiralty apply federal maritime choice-of-law principles derived from the Supreme Court's decision in Lauritzen v. Larsen, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953), and its progeny. See Sundance Cruises Corp. v. The American Bureau of Shipping, 7 F.3d 1077, 1081 (2d Cir.1993); see also Schoenbaum § 6-13, at 280-82.[6] But where the parties specify in their contractual agreement which law will apply, admiralty courts will generally give effect to that choice. See Milanovich v. Costa Crociere, S.p.A., 954 F.2d 763, 767 (D.C.Cir.1992). The D.C. Circuit has held,
 
 
 49
 [C]ourts should honor a contractual choice-of-law provision in a passenger ticket unless the party challenging the enforcement of the provision can establish that enforcement would be unreasonable and unjust, the clause was invalid for such reasons as fraud or overreaching, or enforcement would contravene a strong public policy of the forum in which suit is brought.
 
 
 50
 Id. at 768 (internal quotations omitted).
 
 
 51
 In applying United States law in accordance with the contractual choice-of-law provision in the ticket, the district court began by employing the conflicts-of-laws analysis derived from Lauritzen. This was error.
 
 
 52
 Federal common law applies to choice-of-law determinations in cases based on federal question jurisdiction, such as admiralty. See Schoenberg v. Exportadora de Sal, S.A. de C.V., 930 F.2d 777, 782 (9th Cir.1991). Federal common law follows the approach of the Restatement (Second) of Conflicts of Laws. See id. According to the Restatement, in the absence of a contrary indication, a contractual choice-of-law clause refers to the substantive law of the chosen jurisdiction and does not include that jurisdiction's conflicts-of-laws principles. See Restatement (Second) of Conflicts of Laws § 187(3) & cmt. h (1988). Applying the conflicts principles would reintroduce "the uncertainties of choice of law" and "defeat the basic objectives, namely those of certainty and predictability, which the choice-of-law provision was designed to achieve." Id. at cmt. h; see also Siegelman v. Cunard White Star Ltd., 221 F.2d 189, 194 (2d Cir.1955).
 
 
 53
 By erroneously interpreting the choice clause in the passenger ticket as including a U.S. conflicts analysis, the district court concluded that the Lauritzen conflicts factors compelled application of Liberian law. Because the choice clause does not specifically express the parties' intent to include conflicts principles, however, the Restatement counsels that it refers only to the substantive law of the United States. Thus, instead of applying Lauritzen, the district court should have proceeded to analyze the validity of the clause under federal common law conflicts rules. Cf. Chuidian v. Philippine Nat'l Bank, 976 F.2d 561, 564 (9th Cir.1992).
 
 
 54
 Under the Restatement, courts should enforce the parties' choice of law if the issue "is one which the parties could have resolved by an explicit provision in their agreement directed to that issue." Restatement (Second) of Conflicts of Laws § 187(1) (1988). Even if the parties could not have directed a contractual provision to the issue, courts should honor their choice unless "the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice" or "application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue" and that state would be the state of applicable law in the absence of a choice-of-law clause. Id. at § 187(2).
 
 
 55
 The passenger ticket's choice clause should thus be applied in this case unless the defendants demonstrate that the United States has no substantial relationship to the parties or the cruise or that application of U.S. law would be contrary to a fundamental policy of Liberia and that Liberia has a materially greater interest than the U.S. and would be the chosen law in the absence of a choice clause. While, as the district court held, Liberian law may be the applicable law in the absence of a choice clause under a Lauritzen analysis, the defendants have made no showing that allowing the Chans full recovery of their damages would contravene a fundamental Liberian policy or that Liberia has a materially greater interest in the issue than the U.S. Thus, according to well-settled conflicts principles as embodied in the Restatement, the choice clause in the passenger ticket is enforceable and United States law governs the Chans' claims.
 
 
 56
 In an effort to escape application of the contractual choice-of-law clause, the defendants argue that the High Seas Convention, to which the U.S. is a signatory, holds that the law of a ship's flag generally governs. Defendants never presented to the district court any argument regarding application of the High Seas Convention, however. They fail to cite any authority for their claim that because the Convention provides that the flag country has "exclusive jurisdiction" over the ship, the law of the country of the ship's flag supersedes any contractual choice clause. We decline to consider for the first time on appeal this novel argument. See In re Sternberg, 85 F.3d 1400, 1408 (9th Cir.1996); International Union of Bricklayers v. Martin Jaska, Inc., 752 F.2d 1401, 1404 (9th Cir.1985).
 
 
 57
 Citing Becantinos v. Cunard Line Ltd., 1991 WL 64187 (S.D.N.Y. Apr. 18, 1991), the defendants also claim that the Athens Convention applies of its own force to any ship flying the flag of country that is a party to it. The passenger contract at issue in Becantinos, however, explicitly incorporated the Athens Convention by reference, see id. at * 2, and did not include a contractual choice-of-law clause selecting the law of a state that is not a party to the Convention, as in this case. The defendants provide no authority for the proposition that the Athens Convention applies even where parties have contractually elected to be bound by the substantive law of a non-signatory nation. We therefore reject this argument, also raised by the defendants for the first time on appeal.
 
 III. CONCLUSION
 
 58
 For the foregoing reasons, we reverse the dismissal of the in rem action and the application of Liberian law and affirm on all other grounds. We remand for further proceedings.
 
 
 59
 AFFIRMED, in part, REVERSED, in part, and REMANDED.
 
 
 60
 Neither party to Recover costs.
 
 
 
 [1]
 Adventurer is not a party to this action
 
 
 [2]
 Columbia is not a party to this action
 
 
 [3]
 28 U.S.C. § 1292(a)(3) permits litigants in admiralty cases to appeal interlocutory decrees of the district court that "determin[e] the rights and liabilities of the parties."
 
 
 [4]
 The defendants contest our jurisdiction to hear the Chans' appeal of the district court's dismissal of its in rem action against the ship, arguing that the vessel was not effectively arrested and thus jurisdiction never vested in the district court, a prerequisite to appellate jurisdiction. See Republic Nat'l Bank v. United States, 506 U.S. 80, 84, 113 S.Ct. 554, 557, 121 L.Ed.2d 474 (1992). The defendants, however, provided the Chans with a letter of undertaking in order to avoid arrest of the vessel. This letter of undertaking, which remains in effect, is sufficient to perfect in rem jurisdiction in the absence of the ship's arrest. See Panaconti Shipping Co., S.A. v. M/V Ypapanti, 865 F.2d 705, 707 (5th Cir.1989)
 
 
 [5]
 The Chans confuse the in personam claim with the in rem claim in arguing that their position is strengthened because the vessel never entered United States waters before the first trial date set by the district court. It is irrelevant that, in hindsight, the ship did not enter the jurisdiction prior to the trial date set in the in personum case. Rule C(2) merely requires the presence of the vessel during the pendency of the in rem action, which could not have proceeded to trial until the vessel was arrested anyway
 
 
 [6]
 The Lauritzen factors are: (1) the place of the wrongful act, (2) the law of the flag, (3) the allegiance or domicile of the injured party, (4) the allegiance of the shipowner, (5) the place of the contract, (6) accessibility of a foreign forum, and (7) the law of the forum. See Dalla v. Atlas Maritime Co., 771 F.2d 1277, 1278 (9th Cir.1985)